## MINNESOTA ET AL. *v.* MILLE LACS BAND OF CHIPPEWA INDIANS ET AL.

No. 97–1337.   Argued December 2, 1998—Decided March 24, 1999

174

O'CONNOR, J., delivered the opinion of the Court, in which STEVENS, SOUTER, GINSBURG, and BREYER, JJ., joined. REHNQUIST, C. J., filed a dissenting opinion, in which SCALIA, KENNEDY, and THOMAS, JJ., joined, *post*, p. 208. THOMAS, J., filed a dissenting opinion, *post*, p. 220.

*John L. Kirwin,* Assistant Attorney General of Minnesota, argued the cause for petitioners. With him on the brief were *Hubert H. Humphrey III,* Attorney General, and *Peter L. Tester* and *Michelle E. Beeman,* Assistant Attorneys General. *Randy V. Thompson* argued the cause for Thompson et al., respondents under this Court's Rule 12.6 in support of petitioners. With him on the briefs were *Gary E. Persian* and *Stephen G. Froehle. James Martin Johnson, Michael Jesse,* and *Jennifer Fahey* filed briefs in support of petition-

ers for Aitkin County et al., respondents under this Court's Rule 12.6.

*Marc D. Slonim* argued the cause for respondents Mille Lacs Band of Chippewa Indians et al. With him on the brief were *John B. Arum, Charles J. Cooper,* and *Alan K. Palmer. Barbara McDowell* argued the cause for the United States. With her on the brief were *Solicitor General Waxman, Assistant Attorney General Schiffer, Deputy Solicitor General Kneedler,* and *Elizabeth Ann Peterson. James M. Jannetta* and *Carol Brown Biermeier* filed a brief for respondents Bad River Band of Lake Superior Chippewa Indians et al. *William R. Perry, Anne D. Noto, Henry M. Buffalo, Jr., Dennis J. Peterson,* and *Milton Rosenberg* filed a brief for respondents Fond du Lac Band of Lake Superior Chippewa Indians et al. *Howard J. Bichler* and *M. Joan Warren* filed a brief for respondents St. Croix Chippewa Indians of Wisconsin et al.*

JUSTICE O'CONNOR delivered the opinion of the Court.

In 1837, the United States entered into a Treaty with several Bands of Chippewa Indians. Under the terms of this Treaty, the Indians ceded land in present-day Wisconsin and Minnesota to the United States, and the United States guar-

---

*Briefs of *amici curiae* urging reversal were filed for the State of California et al. by *Daniel E. Lungren,* Attorney General of California, *Roderick E. Walston,* Chief Assistant Attorney General, *Richard M. Frank* and *Jan S. Stevens,* Assistant Attorneys General, and *Joel S. Jacobs,* Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Frank J. Kelley* of Michigan, *Joseph P. Mazurek* of Montana, *Mark Barnett* of South Dakota, *Jan Graham* of Utah, *James E. Doyle* of Wisconsin, and *William U. Hill* of Wyoming; and for the Pacific Legal Foundation by *Brent D. Boger* and *Robin L. Rivett.*

*Carter G. Phillips, Virginia A. Seitz,* and *John Bell* filed a brief for the National Congress of American Indians et al. as *amici curiae* urging affirmance.

*Douglas Y. Freeman* filed a brief for the Citizens Equal Rights Alliance as *amicus curiae.*

anteed to the Indians certain hunting, fishing, and gathering rights on the ceded land. We must decide whether the Chippewa Indians retain these usufructuary rights today. The State of Minnesota argues that the Indians lost these rights through an Executive Order in 1850, an 1855 Treaty, and the admission of Minnesota into the Union in 1858. After an examination of the historical record, we conclude that the Chippewa retain the usufructuary rights guaranteed to them under the 1837 Treaty.

## I

## A

In 1837, several Chippewa Bands, including the respondent Bands here, were summoned to Fort Snelling (near present-day St. Paul, Minnesota) for the negotiation of a treaty with the United States. The United States representative at the negotiations, Wisconsin Territorial Governor Henry Dodge, told the assembled Indians that the United States wanted to purchase certain Chippewa lands east of the Mississippi River, lands located in present-day Wisconsin and Minnesota. App. 46 (1837 Journal of Treaty Negotiations). The Chippewa agreed to sell the land to the United States, but they insisted on preserving their right to hunt, fish, and gather in the ceded territory. See, e. g., id., at 70, 75–76. In response to this request, Governor Dodge stated that he would "make known to your Great Father, your request to be permitted to make sugar, on the lands; and you will be allowed, during his pleasure, to hunt and fish on them." Id., at 78. To these ends, the parties signed a treaty on July 29, 1837. In the first two articles of the 1837 Treaty, the Chippewa ceded land to the United States in return for 20 annual payments of money and goods. The United States also, in the fifth article of the Treaty, guaranteed to the Chippewa the right to hunt, fish, and gather on the ceded lands:

"The privilege of hunting, fishing, and gathering the wild rice, upon the lands, the rivers and the lakes included in the territory ceded, is guarantied [sic] to the Indians, during the pleasure of the President of the United States." 1837 Treaty with the Chippewa, 7 Stat. 537.

In 1842, many of the same Chippewa Bands entered into another Treaty with the United States, again ceding additional lands to the Federal Government in return for annuity payments of goods and money, while reserving usufructuary rights on the ceded lands. 1842 Treaty with the Chippewa, 7 Stat. 591. This Treaty, however, also contained a provision providing that the Indians would be "subject to removal therefrom at the pleasure of the President of the United States." Art. 6, id., at 592.

In the late 1840's, pressure mounted to remove the Chippewa to their unceded lands in the Minnesota Territory. On September 4, 1849, Minnesota Territorial Governor Alexander Ramsey urged the Territorial Legislature to ask the President to remove the Chippewa from the ceded land. App. 878 (Report and Direct Testimony of Dr. Bruce M. White) (hereinafter White Report). The Territorial Legislature complied by passing, in October 1849, "Joint Resolutions relative to the removal of the Chippewa Indians from the ceded lands within the Territory of Minnesota." App. to Pet. for Cert. 567 (hereinafter Joint Resolution). The Joint Resolution urged:

"[T]o ensure the security and tranquility of the white settlements in an extensive and valuable district of this Territory, the Chippewa Indians should be removed from all lands within the Territory to which the Indian Title has been extinguished, and that the privileges given to them by Article Fifth [of the 1837 Treaty] and Article Second [of the 1842 Treaty] be revoked." Ibid.

The Territorial Legislature directed its resolution to Congress, but it eventually made its way to President Zachary Taylor. App. 674 (Report and Direct Testimony of Professor Charles E. Cleland) (hereinafter Cleland Report). It is unclear why the Territorial Legislature directed this resolution to Congress and not to the President. One possible explanation is that, although the 1842 Treaty gave the President authority to remove the Chippewa from that land area, see 1842 Treaty with the Chippewa, Art. 6, 7 Stat. 592, the 1837 Treaty did not confer such authority on the President. Therefore, any action to remove the Chippewa from the 1837 ceded lands would require congressional approval. See App. 674 (Cleland Report).

The historical record provides some clues into the impetus behind this push to remove the Chippewa. In his statement to the Territorial Legislature, Governor Ramsey asserted that the Chippewa needed to be removed because the white settlers in the Sauk Rapids and Swan River area were complaining about the privileges given to the Chippewa Indians. *Id.*, at 878 (White Report). Similarly, the Territorial Legislature urged removal of the Chippewa "to ensure the security and tranquility of the white settlements" in the area. App. to Pet. for Cert. 567 (Joint Resolution). The historical evidence suggests, however, that the white settlers were complaining about the Winnebago Indians, not the Chippewa, in the Sauk Rapids area. See App. 671–672 (Cleland Report). There is also evidence that Minnesotans wanted Indians moved from Wisconsin and Michigan to Minnesota because a large Indian presence brought economic benefits with it. Specifically, an Indian presence provided opportunities to trade with Indians in exchange for their annuity payments, and to build and operate Indian agencies, schools, and farms in exchange for money. The presence of these facilities in an area also opened opportunities for patronage jobs to staff these facilities. See *id.*, at 668–671; *id.*, at 1095 (White Report). See also *id.*, at 149–150 (letter from Rice

to Ramsey, Dec. 1, 1849) ("Minnesota would reap the benefit [from the Chippewa's removal]—whereas now their annuities pass via Detroit and not one dollar do our inhabitants get"). The District Court concluded in this case that "Minnesota politicians, including Ramsey, advocated removal of the Wisconsin Chippewa to Minnesota because they wanted to obtain more of the economic benefits generated by having a large number of Indians residing in their territory." 861 F. Supp. 784, 803 (Minn. 1994).

Whatever the impetus behind the removal effort, President Taylor responded to this pressure by issuing an Executive Order on February 6, 1850. The order provided:

> "The privileges granted temporarily to the Chippewa Indians of the Mississippi, by the Fifth Article of the Treaty made with them on the 29th of July 1837, 'of hunting, fishing and gathering the wild rice, upon the lands, the rivers and the lakes included in the territory ceded' by that treaty to the United States; and the right granted to the Chippewa Indians of the Mississippi and Lake Superior, by the Second Article of the treaty with them of October 4th 1842, of hunting on the territory which they ceded by that treaty, 'with the other usual privileges of occupancy until required to remove by the President of the United States,' are hereby revoked; and all of the said Indians remaining on the lands ceded as aforesaid, are required to remove to their unceded lands." App. to Pet. for Cert. 565.

The officials charged with implementing this order understood it primarily as a removal order, and they proceeded to implement it accordingly. See Record, Doc. No. 311, Plaintiffs' Exh. 88 (letter from Brown to Ramsey, Feb. 6, 1850); App. 161 (letter from Ramsey to Livermore, Mar. 4, 1850). See also 861 F. Supp., at 805 (citing Plaintiffs' Exh. 201 (letter from Livermore to Ramsey, Apr. 2, 1850)) (describing circular prepared to notify Indians of Executive Order); App.

1101–1102 (White Report) (describing circular and stating that "the entire thrust" of the circular had to do with removal).

The Government hoped to entice the Chippewa to remove to Minnesota by changing the location where the annuity payments—the payments for the land cessions—would be made. The Chippewa were to be told that their annuity payments would no longer be made at La Pointe, Wisconsin (within the Chippewa's ceded lands), but, rather, would be made at Sandy Lake, on unceded lands, in the Minnesota Territory. The Government's first annuity payment under this plan, however, ended in disaster. The Chippewa were told they had to be at Sandy Lake by October 25 to receive their 1850· annuity payment. See B. White, The Regional Context of the Removal Order of 1850, § 6, pp. 6–9 to 6–10 (Mar. 1994). By November 10, almost 4,000 Chippewa had assembled at Sandy Lake to receive the payment, but the annuity goods were not completely distributed until December 2. *Id.*, at 6–10. In the meantime, around 150 Chippewa died in an outbreak of measles and dysentery; another 230 Chippewas died on the winter trip home to Wisconsin. App. 228–229 (letter from Buffalo to Lea, Nov. 6, 1851).

The Sandy Lake annuity experience intensified opposition to the removal order among the Chippewa as well as among non-Indian residents of the area. See *id.*, at 206–207 (letter from Warren to Ramsey, Jan. 21, 1851); *id.*, at 214 (letter from Lea to Stuart, June 3, 1851) (describing opposition to the order). See also Record, Doc. No. 311, Plaintiffs' Exh. 93 (Michigan and Wisconsin citizens voice their objections to the order to the President). In the face of this opposition, Commissioner of Indian Affairs Luke Lea wrote to the Secretary of the Interior recommending that the President's 1850 order be modified to allow the Chippewa "to remain for the present in the country they now occupy." App. 215 (letter from Lea to Stuart, June 3, 1851). According to Commissioner Lea, removal of the Wisconsin Bands "is not re-

quired by the interests of the citizens or Government of the United States and would in its consequences in all probability be disastrous to the Indians." *Ibid.* Three months later, the Acting Commissioner of Indian Affairs wrote to the Secretary to inform him that 1,000 Chippewa were assembled at La Pointe, but that they could not be removed from the area without the use of force. He sought the Secretary's approval "to suspend the removal of these Indians until the determination of the President upon the recommendation of the commissioner is made known to this office." *Id.*, at 223–224 (letter from Mix to Graham, Aug. 23, 1851). Two days later, the Secretary of the Interior issued the requested authorization, instructing the Commissioner "to suspend the removal of the Chippeway *[sic]* Indians until the final determination of the President." *Id.*, at 225 (letter from Abraham to Lea, Aug. 25, 1851). Commissioner Lea immediately telegraphed the local officials with instructions to "[s]uspend action with reference to the removal of Lake Superior Chippewas for further orders." *Ibid.* (telegram from Lea to Watrous, Aug. 25, 1851). As the State's own expert historian testified, "[f]ederal efforts to remove the Lake Superior Chippewa to the Mississippi River effectively ended in the summer of 1851." *Id.*, at 986 (Report of Alan S. Newell).

Although Governor Ramsey still hoped to entice the Chippewa to remove by limiting annuity payments to only those Indians who removed to unceded lands, see *id.*, at 235–236 (letter from Ramsey to Lea, Dec. 26, 1851), this plan, too, was quickly abandoned. In 1853, Franklin Pierce became President, and he appointed George Manypenny as Commissioner of Indian Affairs. The new administration reversed Governor Ramsey's policy, and in 1853, annuity payments were once again made within the ceded territory. See, *e. g.*, Record, Doc. No. 311, Plaintiffs' Exh. 119, p. 2 (letter from Gorman to Manypenny, Oct. 8, 1853); Plaintiffs' Exh. 122 (letter from Herriman to Gorman, Nov. 10, 1853); see also Plain-

tiffs' Exh. 120 (letter from Wheeler to Parents, Oct. 20, 1853). As Indian Agent Henry Gilbert explained, the earlier "change from La Pointe to [Sandy Lake] was only an incident of the order for removal," thus suggesting that the resumption of the payments at La Pointe was appropriate because the 1850 removal order had been abandoned.  App. 243 (letter from Gilbert to Manypenny, Dec. 14, 1853).

In 1849, white lumbermen built a dam on the Rum River (within the Minnesota portion of the 1837 ceded Territory), and the Mille Lacs Band of Chippewa protested that the dam interfered with its wild rice harvest.  This dispute erupted in 1855 when violence broke out between the Chippewa and the lumbermen, necessitating a call for federal troops.  In February 1855, the Governor of the Minnesota Territory, Willis Gorman, who also served as the ex officio superintendent of Indian affairs for the Territory, wrote to Commissioner Manypenny about this dispute.  In his letter, he noted that "[t]he lands occupied by the timbermen have been surveyed and sold by the United States and the Indians have no other treaty interests *except hunting and fishing.*"  *Id.*, at 295–296 (letter of Feb. 16, 1855) (emphasis added).  There is no indication that Commissioner Manypenny disagreed with Governor Gorman's characterization of Chippewa treaty rights.  In June of the same year, Governor Gorman wrote to Mille Lacs Chief Little Hill that even if the dam was located within the Mille Lacs Reservation under the 1855 Treaty, the dam "was put there long before you had any rights there except to hunt and fish."  Record, Doc. No. 163, Plaintiffs' Exh. 19 (letter of June 4, 1855).  Thus, as of 1855, the federal official responsible for Indian affairs in the Minnesota Territory acknowledged and recognized Chippewa rights to hunt and fish in the 1837 ceded Territory.

On the other hand, there are statements by federal officials in the late 19th century and the first half of the 20th century that suggest that the Federal Government no longer recognized Chippewa usufructuary rights under the 1837 Treaty.

See, *e. g.*, App. 536–539 (letter from Acting Commissioner of Indian Affairs to Heatwole, Dec. 16, 1898); *id.*, at 547–548 (letter from Commissioner of Indian Affairs Collier to Reynolds, Apr. 30, 1934); App. to Pet. for Cert. 575–578 (letter from President Roosevelt to Whitebird, Mar. 1, 1938). But see, *e. g.*, App. 541 (letter from Meritt to Hammitt, Dec. 14, 1925) (Office of Indian Affairs noting that "[a]pparently, . . . there is merit in the claims of the Indians" that they have hunting and fishing rights under the 1837 Treaty); Additional Brief for United States in *United States* v. *Thomas*, O. T. 1893, No. 668, pp. 2–3 (with respect to the 1842 Treaty, arguing that no Executive Order requiring Chippewa removal had ever been made).

Although the United States abandoned its removal policy, it did not abandon its attempts to acquire more Chippewa land. To this end, in the spring of 1854, Congress began considering legislation to authorize additional treaties for the purchase of Chippewa lands. The House of Representatives debated a bill "to provide for the extinguishment of the title of the Chippewa Indians to the lands owned and claimed by them in the Territory of Minnesota and State of Wisconsin." Cong. Globe, 33d Cong., 1st Sess., 1032 (1854). This bill did not require the removal of the Indians, but instead provided for the establishment of reservations within the ceded territories on which the Indians could remain.

The treaty authorization bill stalled in the Senate during 1854, but Commissioner of Indian Affairs George Manypenny began to implement it nonetheless. On August 11, he instructed Indian Agent Henry Gilbert to begin treaty negotiations to acquire more land from the Chippewa. Specifically, he instructed Gilbert to acquire "all the country" the Chippewa own or claim in the Minnesota Territory and the State of Wisconsin, except for some land that would be set aside for reservations. App. 264. Gilbert negotiated such a Treaty with several Chippewa Bands, 1854 Treaty with the Chippewa, 10 Stat. 1109, although for reasons now lost to

history, the Mille Lacs Band of Chippewa was not a party to this Treaty. The signatory Chippewa Bands ceded additional land to the United States, and certain lands were set aside as reservations for the Bands. *Id.*, Art. 2. In addition, the 1854 Treaty established new hunting and fishing rights in the territory ceded by the Treaty. *Id.*, Art. 11.

When the Senate finally passed the authorizing legislation in December 1854, Minnesota's territorial delegate to Congress recommended to Commissioner Manypenny that he negotiate a treaty with the Mississippi, Pillager, and Lake Winnibigoshish Bands of Chippewa Indians. App. 286–287 (letter from Rice to Manypenny, Dec. 17, 1854). Commissioner Manypenny summoned representatives of those Bands to Washington, D. C., for the treaty negotiations, which were held in February 1855. See *id.*, at 288 (letter from Manypenny to Gorman, Jan. 4, 1855). The purpose and result of these negotiations was the sale of Chippewa lands to the United States. To this end, the first article of the 1855 Treaty contains two sentences:

> "The Mississippi, Pillager, and Lake Winnibigoshish bands of Chippewa Indians hereby cede, sell, and convey to the United States all their right, title, and interest in, and to, the lands now owned and claimed by them, in the Territory of Minnesota, and included within the following boundaries, viz: [describing territorial boundaries]. And the said Indians do further fully and entirely relinquish and convey to the United States, any and all right, title, and interest, of whatsoever nature the same may be, which they may now have in, and to any other lands in the Territory of Minnesota or elsewhere." 10 Stat. 1165–1166.

Article 2 set aside lands in the area as reservations for the signatory tribes. *Id.*, at 1166–1167. The Treaty, however, makes no mention of hunting and fishing rights, whether to reserve new usufructuary rights or to abolish rights guaran-

teed by previous treaties. The Treaty Journal also reveals no discussion of hunting and fishing rights. App. 297–356 (Documents Relating to the Negotiation of the Treaty of Feb. 22, 1855) (hereinafter 1855 Treaty Journal)).

A little over three years after the 1855 Treaty was signed, Minnesota was admitted to the Union. See Act of May 11, 1858, 11 Stat. 285. The admission Act is silent with respect to Indian treaty rights.

## B

In 1990, the Mille Lacs Band of Chippewa Indians and several of its members filed suit in the Federal District Court for the District of Minnesota against the State of Minnesota, the Minnesota Department of Natural Resources, and various state officers (collectively State), seeking, among other things, a declaratory judgment that they retained their usufructuary rights under the 1837 Treaty and an injunction to prevent the State's interference with those rights. The United States intervened as a plaintiff in the suit; nine counties and six private landowners intervened as defendants.[1] The District Court bifurcated the case into two phases. Phase I of the litigation would determine whether, and to what extent, the Mille Lacs Band retained any usufructuary rights under the 1837 Treaty, while Phase II would determine the validity of particular state measures regulating any retained rights.

In the first decision on the Phase I issues, the District Court rejected numerous defenses posed by the defendants and set the matter for trial. 853 F. Supp. 1118 (Minn. 1994) (Murphy, C. J.). After a bench trial on the Phase I issues, the District Court concluded that the Mille Lacs Band retained its usufructuary rights as guaranteed by the 1837 Treaty. 861 F. Supp. 784 (1994). Specifically, as relevant

---

[1] The intervening counties are Aitkin, Benton, Crow Wing, Isanti, Kanabec, Mille Lacs, Morrison, Pine, and Sherburne. The intervening landowners are John W. Thompson, Jenny Thompson, Joseph N. Karpen, LeRoy Burling, Glenn E. Thompson, and Gary M. Kiedrowski.

186

here, the court rejected the State's arguments that the 1837 Treaty rights were extinguished by the 1850 Executive Order or by the 1855 Treaty with the Chippewa. *Id.*, at 822–835. With respect to the 1850 Executive Order, the District Court held, in relevant part, that the order was unlawful because the President had no authority to order removal of the Chippewa without their consent. *Id.*, at 823–826. The District Court also concluded that the United States ultimately abandoned and repealed the removal policy embodied in the 1850 order. *Id.*, at 829–830. With respect to the 1855 Treaty, the District Court reviewed the historical record and found that the parties to that agreement did not intend to abrogate the usufructuary privileges guaranteed by the 1837 Treaty. *Id.*, at 830–835.

At this point in the case, the District Court permitted several Wisconsin Bands of Chippewa to intervene as plaintiffs[2] and allowed the defendants to interpose new defenses. As is relevant here, the defendants asserted for the first time that the Bands' usufructuary rights were extinguished by Minnesota's admission to the Union in 1858. The District Court rejected this new defense. No. 3–94–1226 (D. Minn., Mar. 29, 1996) (Davis, J.), App. to Pet. for Cert. 182–189.

Simultaneously with this litigation, the Fond du Lac Band of Chippewa Indians and several of its members filed a separate suit against Minnesota state officials, seeking a declaration that they retained their rights to hunt, fish, and gather pursuant to the 1837 and 1854 Treaties. Two Minnesota landowners intervened as defendants,[3] and the District

---

[2] The Wisconsin Bands are also respondents in this Court: St. Croix Chippewa Indians of Wisconsin, Lac du Flambeau Band of Lake Superior Chippewas, Bad River Band of Lake Superior Chippewa Indians, Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin, Sokaogan Chippewa Community, and Red Cliff Band of Lake Superior Chippewa.

[3] The landowners who intervened in this suit are Robert J. Edmonds and Michael Sheff. These landowners, along with the six landowners who intervened in the Mille Lacs Band suit, have filed briefs in this Court in

Court issued an order, like the order in the Mille Lacs Band case, bifurcating the litigation into two phases. In March 1996, the District Court held that the Fond du Lac Band retained its hunting and fishing rights. *Fond du Lac Band of Chippewa Indians* v. *Carlson*, Civ. No. 5–92–159 (D. Minn., Mar. 18, 1996) (Kyle, J.), App. to Pet. for Cert. 419.

In June 1996, the District Court consolidated that part of the Fond du Lac litigation concerning the 1837 Treaty rights with the Mille Lacs litigation for Phase II. In Phase II, the State and the Bands agreed to a Conservation Code and Management Plan to regulate hunting, fishing, and gathering in the Minnesota portion of the territory ceded in the 1837 Treaty. Even after this agreement, however, several resource allocation and regulation issues remained unresolved; the District Court resolved these issues in a final order issued in 1997. See 952 F. Supp. 1362 (Minn.) (Davis, J.).

On appeal, the Court of Appeals for the Eighth Circuit affirmed. 124 F. 3d 904 (1997). Three parts of the Eighth Circuit's decision are relevant here. First, the Eighth Circuit rejected the State's argument that President Taylor's 1850 Executive Order abrogated the Indians' hunting, fishing, and gathering rights as guaranteed by the 1837 Treaty. The Court of Appeals concluded that President Taylor did not have the authority to issue the removal order and that the invalid removal order was inseverable from the portion of the order purporting to abrogate Chippewa usufructuary rights. *Id.*, at 914–918.

Second, the Court of Appeals concluded that the 1855 Treaty did not extinguish the Mille Lacs Band's usufructuary privileges. *Id.*, at 919–921. The court noted that the revocation of hunting and fishing rights was neither discussed during the Treaty negotiations nor mentioned in the Treaty itself. *Id.*, at 920. The court also rejected the State's argument that this Court's decision in *Oregon Dept. of Fish and*

support of the State. The counties, too, have filed briefs in support of the State.

*Wildlife* v. *Klamath Tribe,* 473 U. S. 753 (1985), required a different result. 124 F. 3d, at 921. Third, the court rejected the State's argument that, under the "equal footing doctrine," Minnesota's entrance into the Union extinguished any Indian treaty rights. *Id.,* at 926–929. Specifically, the Court of Appeals found no evidence of congressional intent in enacting the Minnesota statehood Act to abrogate Chippewa usufructuary rights, *id.,* at 929, and it rejected the argument that *Ward* v. *Race Horse,* 163 U. S. 504 (1896), controlled the resolution of this issue, 124 F. 3d, at 926–927.

In sum, the Court of Appeals held that the Chippewa retained their usufructuary rights under the 1837 Treaty with respect to land located in the State of Minnesota. This conclusion is consistent with the Court of Appeals for the Seventh Circuit's earlier decision holding that the Chippewa retained those same rights with respect to the ceded land located in Wisconsin. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians* v. *Voigt,* 700 F. 2d 341, appeal dism'd and cert. denied *sub nom. Besadny* v. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians,* 464 U. S. 805 (1983) (Brennan, Marshall, and STEVENS, JJ., would affirm). The Court of Appeals for the Eighth Circuit denied a petition for rehearing and a suggestion for rehearing en banc. The State of Minnesota, the landowners, and the counties all filed petitions for writs of certiorari, and we granted the State's petition. 524 U. S. 915 (1998).

## II

We are first asked to decide whether President Taylor's Executive Order of February 6, 1850, terminated Chippewa hunting, fishing, and gathering rights under the 1837 Treaty. The Court of Appeals began its analysis of this question with a statement of black letter law: "'The President's power, if any, to issue the order must stem either from an act of Con-

gress or from the Constitution itself.'" 124 F. 3d, at 915 (quoting *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, 585 (1952)). The court considered whether the President had authority to issue the removal order under the 1830 Removal Act (hereinafter Removal Act), 4 Stat. 411. The Removal Act authorized the President to convey land west of the Mississippi to Indian tribes that chose to "exchange the lands where they now reside, and remove there." *Id.,* at 412. According to the Court of Appeals, the Removal Act only allowed the removal of Indians who had consented to removal. 124 F. 3d, at 915–916. Because the Chippewa had not consented to removal, according to the court, the Removal Act could not provide authority for the President's 1850 removal order. *Id.,* at 916–917.

In this Court, no party challenges the Court of Appeals' conclusion that the Removal Act did not authorize the President's removal order. The landowners argue that the Removal Act was irrelevant because it applied only to land *exchanges,* and that even if it required consent for such land exchanges, it did not prohibit other means of removing Indians. See Brief for Respondent Thompson et al. 22–23. We agree that the Removal Act did not forbid the President's removal order, but as noted by the Court of Appeals, it also did not authorize that order.

Because the Removal Act did not authorize the 1850 removal order, we must look elsewhere for a constitutional or statutory authorization for the order. In this Court, only the landowners argue for an alternative source of authority; they argue that the President's removal order was authorized by the 1837 Treaty itself. See *ibid.* There is no support for this proposition, however. The Treaty makes no mention of removal, and there was no discussion of removal during the Treaty negotiations. Although the United States could have negotiated a treaty in 1837 providing for removal of the Chippewa—and it negotiated several such re-

moval treaties with Indian tribes in 1837[4]—the 1837 Treaty with the Chippewa did not contain any provisions authorizing a removal order. The silence in the Treaty, in fact, is consistent with the United States' objectives in negotiating it. Commissioner of Indian Affairs Harris explained the United States' goals for the 1837 Treaty in a letter to Governor Dodge on May 13, 1837. App. 42. In this letter, Harris explained that through this Treaty, the United States wanted to purchase Chippewa land for the pinewoods located on it; the letter contains no reference to removal of the Chippewa. *Ibid.* Based on the record before us, the proposition that the 1837 Treaty authorized the President's 1850 removal order is unfounded. Because the parties have pointed to no colorable source of authority for the President's removal order, we agree with the Court of Appeals' conclusion that the 1850 removal order was unauthorized.

The State argues that even if the *removal* portion of the order was invalid, the 1837 Treaty privileges were nevertheless revoked because the invalid removal order was severable from the portion of the order revoking Chippewa

---

[4] See 1837 Treaty with the Saganaw Chippewa, Art. 6, 7 Stat. 530 ("The said tribe agrees to remove from the State of Michigan, as soon as a proper location can be obtained"); 1837 Treaty with the Potawatomie, Art. 1, 7 Stat. 533 ("And the chiefs and head men above named, for themselves and their bands, do hereby cede to the United States all their interest in said lands, and agree to remove to a country that may be provided for them by the President of the United States, southwest of the Missouri river, within two years from the ratification of this treaty"); 1837 Treaty with the Sacs and Foxes, Art. 4, 7 Stat. 541 ("The Sacs and Foxes agree to remove from the tract ceded, with the exception of Keokuck's village, possession of which may be retained for two years, within eight months from the ratification of this treaty"); 1837 Treaty with the Winnebago, Art. 3, 7 Stat. 544–545 ("The said Indians agree to remove within eight months from the ratification of this treaty, to that portion of the neutral ground west of the Mississippi, which was conveyed to them in the second article of the treaty of September 21st, 1832, and the United States agree that the said Indians may hunt upon the western part of said neutral ground until they shall procure a permanent settlement").

usufructuary rights. Although this Court has often considered the severability of *statutes,* we have never addressed whether *Executive Orders* can be severed into valid and invalid parts, and if so, what standard should govern the inquiry. In this case, the Court of Appeals assumed that Executive Orders are severable, and that the standards applicable in statutory cases apply without modification in the context of Executive Orders. 124 F. 3d, at 917 (citing *In re Reyes,* 910 F. 2d 611, 613 (CA9 1990)). Because no party before this Court challenges the applicability of these standards, for purposes of this case we shall assume, *arguendo,* that the severability standard for statutes also applies to Executive Orders.

The inquiry into whether a statute is severable is essentially an inquiry into legislative intent. *Regan* v. *Time, Inc.,* 468 U. S. 641, 653 (1984) (plurality opinion). We stated the traditional test for severability over 65 years ago: "Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Champlin Refining Co.* v. *Corporation Comm'n of Okla.,* 286 U. S. 210, 234 (1932). See also *Alaska Airlines, Inc.* v. *Brock,* 480 U. S. 678, 684 (1987); *Regan* v. *Time, Inc., supra,* at 653. Translated to the present context, we must determine whether the President would not have revoked the 1837 Treaty privileges if he could not issue the removal order.

We think it is clear that President Taylor intended the 1850 order to stand or fall as a whole. The 1850 order embodied a single, coherent policy, the predominant purpose of which was removal of the Chippewa from the lands that they had ceded to the United States. The federal officials charged with implementing the order certainly understood it as such. As soon as the Commissioner of Indian Affairs received a copy of the order, he sent it to Governor Ramsey and placed him in charge of its implementation. The Com-

missioner's letter to Ramsey noted in passing that the order revoked the Chippewa's usufructuary privileges, but it did not discuss implementation of that part of the order. Rather, the letter addressed the mechanics of implementing the *removal* order. Record, Doc. No. 311, Plaintiffs' Exh. 88 (letter from Brown to Ramsey, Feb. 6, 1850). Governor Ramsey immediately wrote to his subagent at La Pointe (on Lake Superior), noting that he had enclosed a "copy of the order of the President *for the removal* of the Chippewas, from the lands they have ceded." App. 161 (letter from Ramsey to Livermore, Mar. 4, 1850) (emphasis added). This letter made no mention of the revocation of Indian hunting and fishing rights. *Id.*, at 161–163. The La Pointe subagent, in turn, prepared a circular to notify the Wisconsin Bands of the Executive Order, but this circular, too, focused on removal of the Chippewa. See 861 F. Supp., at 805 (describing circular).

When the 1850 order is understood as announcing a removal policy, the portion of the order revoking Chippewa usufructuary rights is seen to perform an integral function in this policy. The order tells the Indians to "go," and also tells them not to return to the ceded lands to hunt and fish. The State suggests that President Taylor might also have revoked Chippewa usufructuary rights as a kind of "incentive program" to *encourage* the Indians to remove had he known that he could not order their removal directly. The State points to no evidence, however, that the President or his aides ever considered the abrogation of hunting and fishing rights as an "incentive program." Moreover, the State does not explain how this incentive was to operate. As the State characterizes Chippewa Treaty rights, the revocation of those rights would not have prevented the Chippewa from hunting, fishing, and gathering on the ceded territory; the revocation of treaty rights would merely have subjected Chippewa hunters, fishers, and gatherers to territorial, and, later, state regulation. Brief for Petitioners 47, n. 21. The

State does not explain how, if the Chippewa were still permitted to hunt, fish, and gather on the ceded territory, the revocation of the treaty rights would have encouraged the Chippewa to remove to their unceded lands.

There is also no evidence that the treaty privileges themselves—as opposed to the presence of the Indians—caused any problems necessitating the revocation of those privileges. In other words, there is little historical evidence that the treaty privileges would have been revoked for some other purpose. The only evidence in this regard is Governor Ramsey's statement to the Minnesota Territorial Legislature that settlers in the Sauk Rapids and Swan River area were complaining about the Chippewa Treaty privileges. But the historical record suggests that the settlers were complaining about the Winnebago Indians, and not the Chippewa, in that area. See App. 671–672 (Cleland Report). When Governor Ramsey was put in charge of enforcing the 1850 Executive Order, he made no efforts to remove the Chippewa from the Sauk Rapids area or to restrict hunting and fishing privileges there. In fact, his attempts to enforce the order consisted primarily of efforts to move the Chippewa from the Wisconsin and Michigan areas to Minnesota—closer to the Sauk Rapids and Swan River settlements. App. 1099–1100 (White Report); *id.*, at 677–678, 1025–1027 (Cleland Report). More importantly, Governor Ramsey and the Minnesota Territorial Legislature explicitly tied revocation of the treaty privileges to removal. Common sense explains the logic of this strategy: If the legislature was concerned with ensuring "the security and tranquility of the white settlements," App. to Pet. for Cert. 567 (Joint Resolution), this concern was not addressed by merely revoking Indian treaty rights; the Indians had to be removed.

We conclude that President Taylor's 1850 Executive Order was ineffective to terminate Chippewa usufructuary rights under the 1837 Treaty. The State has pointed to no statutory or constitutional authority for the President's removal

194

order, and the Executive Order, embodying as it did one coherent policy, is inseverable.[5] We do not mean to suggest that a President, now or in the future, cannot revoke

---

[5] THE CHIEF JUSTICE disagrees with this conclusion primarily because he understands the removal order to be a mechanism for enforcing the revocation of usufructuary rights. *Post*, at 213–214 (dissenting opinion). The implicit premise of this argument is that the President had the inherent power to order the removal of the Chippewa from public lands; this premise is flawed. The Chippewa were on the land long before the United States acquired title to it. The 1837 Treaty does not speak to the right of the United States to order them off the land upon acquisition of title, and in fact, the usufructuary rights guaranteed by the Treaty presumed that the Chippewa would continue to be on the land. Although the revocation of the rights might have justified measures to make sure that the Chippewa were not hunting, fishing, or gathering, it does not follow that revocation of the usufructuary rights permitted the United States to remove the Chippewa from the land completely. THE CHIEF JUSTICE's suggestion that the removal order was merely a measure to enforce the revocation of the usufructuary rights is thus unwarranted. It cannot be presumed that the ends justified the means; it cannot be presumed that the rights of the United States under the Treaty included the right to order removal in defense of the revocation of usufructuary rights. The Treaty, the statutory law, and the Constitution were silent on this matter, and to presume the existence of such Presidential power would run counter to the principles that treaties are to be interpreted liberally in favor of the Indians, *Washington* v. *Washington State Commercial Passenger Fishing Vessel Assn.*, 443 U. S. 658, 675–676 (1979), and treaty ambiguities to be resolved in their favor, *Winters* v. *United States*, 207 U. S. 564, 576–577 (1908).

THE CHIEF JUSTICE also argues that the removal order ought to be severable from the part of the order purporting to extinguish Chippewa usufructuary rights because of the strong presumption supporting the legality of executive action that has been authorized expressly or by implication. *Post*, at 215–216. Presumably, THE CHIEF JUSTICE understands the 1837 Treaty to authorize the executive action in question. In this context, however, any general presumption about the legality of executive action runs into the principle that treaty ambiguities are to be resolved in favor of the Indians. *Winters* v. *United States*, *supra*, at 576–577; see also *County of Yakima* v. *Confederated Tribes and Bands of Yakima Nation*, 502 U. S. 251, 269 (1992). We do not think the general presumption relied upon by THE CHIEF JUSTICE carries the same weight when balanced against the counterpresumption specific to Indian treaties.

Chippewa usufructuary rights in accordance with the terms of the 1837 Treaty. All we conclude today is that the President's 1850 Executive Order was insufficient to accomplish this revocation because it was not severable from the invalid removal order.

### III

The State argues that the Mille Lacs Band of Chippewa Indians relinquished its usufructuary rights under the 1855 Treaty with the Chippewa. Specifically, the State argues that the Band unambiguously relinquished its usufructuary rights by agreeing to the second sentence of Article 1 in that Treaty:

> "And the said Indians do further fully and entirely relinquish and convey to the United States, any and all right, title, and interest, of whatsoever nature the same may be, which they may now have in, and to any other lands in the Territory of Minnesota or elsewhere." 10 Stat. 1166.

This sentence, however, does not mention the 1837 Treaty, and it does not mention hunting, fishing, and gathering rights. The entire 1855 Treaty, in fact, is devoid of any language expressly mentioning—much less abrogating—usufructuary rights. Similarly, the Treaty contains no language providing money for the abrogation of previously held rights. These omissions are telling because the United States treaty drafters had the sophistication and experience to use express language for the abrogation of treaty rights. In fact, just a few months after Commissioner Manypenny completed the 1855 Treaty, he negotiated a Treaty with the Chippewa of Sault Ste. Marie that expressly revoked fishing rights that had been reserved in an earlier Treaty. See Treaty with the Chippewa of Sault Ste. Marie, Art. 1, 11 Stat. 631 ("The said Chippewa Indians surrender to the United States the right of fishing at the falls of St. Mary's

. . . secured to them by the treaty of June 16, 1820").[6]   See, *e. g., Choctaw Nation* v. *Oklahoma,* 397 U. S. 620, 631 (1970) (rejecting argument that language in Treaty had special meaning when United States was competent to state that meaning more clearly).

The State argues that despite any explicit reference to the 1837 Treaty rights, or to usufructuary rights more generally, the second sentence of Article 1 nevertheless abrogates those rights.   But to determine whether this language abrogates Chippewa Treaty rights, we look beyond the written words to the larger context that frames the Treaty, including "the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Choctaw Nation* v. *United States,* 318 U. S. 423, 432 (1943); see also *El Al Israel Airlines, Ltd.* v. *Tsui Yuan Tseng,* 525 U. S. 155, 167 (1999). In this case, an examination of the historical record provides insight into how the parties to the Treaty understood the terms of the agreement.   This insight is especially helpful to the extent that it sheds light on how the Chippewa signatories to the Treaty understood the agreement because we interpret Indian treaties to give effect to the terms as the Indians themselves would have understood them.   See *Washington* v. *Washington State Commercial Passenger Fishing Vessel Assn.,* 443 U. S. 658, 675–676 (1979); *United States* v. *Winans,* 198 U. S. 371, 380–381 (1905).

The 1855 Treaty was designed primarily to transfer Chippewa land to the United States, not to terminate Chippewa usufructuary rights.   It was negotiated under the authority of the Act of December 19, 1854.   This Act authorized treaty

---

[6] See also, *e. g.,* 1846 Treaty with the Winnebago, Art. IV, 9 Stat. 878 (Government agrees to pay Winnebago Indians $40,000 "for release of hunting privileges, on the lands adjacent to their present home"); 1837 Treaty with the Sacs and Foxes, Art. 2, 7 Stat. 543 (specifically ceding "all the right to locate, for hunting or other purposes, on the land ceded in the first article of the treaty of July 15th 1830").

negotiations with the Chippewa "for the extinguishment of their title to all the lands owned and claimed by them in the Territory of Minnesota and State of Wisconsin."   Ch. 7, 10 Stat. 598.   The Act is silent with respect to authorizing agreements to terminate Indian usufructuary privileges, and this silence was likely not accidental.   During Senate debate on the Act, Senator Sebastian, the chairman of the Committee on Indian Affairs, stated that the treaties to be negotiated under the Act would "reserv[e] to them [*i. e.*, the Chippewa] those rights which are secured by former treaties." Cong. Globe, 33d Cong., 1st Sess., 1404 (1854).

   In the winter of 1854–1855, Commissioner Manypenny summoned several Chippewa chiefs to Washington, D. C., to begin negotiations over the sale of Chippewa land in Minnesota to the United States.   See App. 288 (letter from Manypenny to Gorman, Jan. 4, 1855).   The negotiations ran from February 12 through February 22.   Commissioner Manypenny opened the negotiations by telling the Chippewa chiefs that his goal for the negotiations was to buy a portion of their land, *id.*, at 304 (1855 Treaty Journal), and he stayed firm to this proposed course throughout the talks, focusing the discussions on the purchase of Chippewa land.   Indeed all of the participants in the negotiations, including the Indians, understood that the purpose of the negotiations was to transfer Indian land to the United States.   The Chief of the Pillager Band of Chippewa stated: "It appears to me that I understand what you want, and your views from the few words I have heard you speak.   You want land."   *Id.*, at 309 (1855 Treaty Journal) (statement of Flat Mouth).   Commissioner Manypenny confirmed that the chief correctly understood the purpose of the negotiations:

> "He appears to understand the object of the interview. His people had more land than they wanted or could use, and stood in need of money; and I have more money than I need, but want more land."   *Ibid.*

198

See also *id.*, at 304 (statement of Hole-in-the-Day, the principal negotiator for the Chippewa: "Your words strike us in this way. They are very short. 'I want to buy your land.' These words are very expressive—very curt").

Like the authorizing legislation, the Treaty Journal, recording the course of the negotiations themselves, is silent with respect to usufructuary rights. The journal records no discussion of the 1837 Treaty, of hunting, fishing, and gathering rights, or of the abrogation of those rights. *Id.*, at 297–356. This silence suggests that the Chippewa did not understand the proposed Treaty to abrogate their usufructuary rights as guaranteed by other treaties. It is difficult to believe that in 1855, the Chippewa would have agreed to relinquish the usufructuary rights they had fought to preserve in 1837 without at least a passing word about the relinquishment.

After the Treaty was signed, President Pierce submitted it to the Senate for ratification, along with an accompanying memorandum from Commissioner Manypenny describing the Treaty he had just negotiated. Like the Treaty and the Treaty Journal, this report is silent about hunting, fishing, and gathering rights. *Id.*, at 290–294 (message of the President of the United States communicating a treaty made with the Mississippi, the Pillager, and the Lake Winnibigoshish Bands of Chippewa Indians).

Commissioner Manypenny's memorandum on the 1855 Treaty is illuminating not only for what it did not say, but also for what it did say: The report suggests a purpose for the second sentence of Article 1. According to the Commissioner's report, the Treaty provided for the purchase of between 11 and 14 million acres of Chippewa land within the boundaries defined by the first article. In addition to this defined tract of land, the Commissioner continued, "those Indians (and especially the Pillager and Lake Winnibigoshish bands) have some right of interest in a large extent of other lands in common with other Indians in Minnesota, and which

right or interest ... is also ceded to the United States." *Id.*, at 292. This part of the Commissioner's report suggests that the second sentence of Article 1 was designed not to extinguish usufructuary rights, but rather to extinguish remaining Chippewa *land claims*. The "other lands" do not appear to be the lands ceded by the 1837 Treaty. The Pillager and Lake Winnibigoshish Bands did not occupy lands in the 1837 ceded territory, so it is unlikely that the Commissioner would have described the usufructuary rights guaranteed by the 1837 Treaty as belonging "especially" to those Bands. Moreover, the 1837 Treaty privileges were held in common largely with Chippewa bands in Wisconsin, not with "other Indians in Minnesota." In other words, the second sentence of Article 1 did not extinguish usufructuary privileges, but rather it extinguished Chippewa land claims that Commissioner Manypenny could not describe precisely. See *e. g., id.*, at 317–318 (1855 Treaty Journal) (Pillager negotiator declines to "state precisely what our bands claim as a right"). See also 861 F. Supp., at 816–817.

One final part of the historical record also suggests that the 1855 Treaty was a land purchase treaty and not a treaty that also terminated usufructuary rights: the 1854 Treaty with the Chippewa. Most of the Chippewa Bands that resided within the territory ceded by the 1837 Treaty were signatories to the 1854 Treaty; only the Mille Lacs Band was a party to the 1855 Treaty. If the United States had intended to abrogate Chippewa usufructuary rights under the 1837 Treaty, it almost certainly would have included a provision to that effect in the 1854 Treaty, yet that Treaty contains no such provision. To the contrary, it expressly secures *new* usufructuary rights to the signatory Bands on the newly ceded territory. The State proposes no explanation— compelling or otherwise—for why the United States would have wanted to abrogate the Mille Lacs Band's hunting and fishing rights, while leaving intact the other Bands' rights to hunt and fish on the same territory.

To summarize, the historical record provides no support for the theory that the second sentence of Article 1 was designed to abrogate the usufructuary privileges guaranteed under the 1837 Treaty, but it does support the theory that the Treaty, and Article 1 in particular, was designed to transfer Chippewa land to the United States. At the very least, the historical record refutes the State's assertion that the 1855 Treaty "unambiguously" abrogated the 1837 hunting, fishing, and gathering privileges. Given this plausible ambiguity, we cannot agree with the State that the 1855 Treaty abrogated Chippewa usufructuary rights. We have held that Indian treaties are to be interpreted liberally in favor of the Indians, *Washington v. Washington State Commercial Passenger Fishing Vessel Assn.*, 443 U. S., at 675–676; *Choctaw Nation v. United States*, 318 U. S., at 432, and that any ambiguities are to be resolved in their favor, *Winters v. United States*, 207 U. S. 564, 576–577 (1908). See also *County of Yakima v. Confederated Tribes and Bands of Yakima Nation*, 502 U. S. 251, 269 (1992).

To attack the conclusion that the 1855 Treaty does not abrogate the usufructuary rights guaranteed under the 1837 Treaty, the State relies primarily on our decision in *Oregon Dept. of Fish and Wildlife v. Klamath Tribe*, 473 U. S. 753 (1985). *Klamath* required this Court to interpret two agreements. In the first agreement, an 1864 Treaty between the United States and several Indian Tribes now collectively known as the Klamath Indian Tribe, the Indians conveyed their remaining lands to the United States, and a portion of this land was set aside as a reservation. *Id.*, at 755. The 1864 Treaty provided that the Tribe had the "'exclusive right of taking fish in the streams and lakes, included in said reservation, and of gathering edible roots, seeds, and berries within its limits,'" but it provided for no off-reservation usufructuary rights. *Ibid.* (quoting Treaty of Oct. 14, 1864). Due to a surveying error, the reservation excluded land that, under the terms of the Treaty, should

have been included within the reservation. Thus, in 1901, the United States and the Tribe entered into a second agreement, in which the United States agreed to compensate the Tribe for those lands, and the Tribe agreed to "'cede, surrender, grant, and convey to the United States all their claim, right, title and interest in and to'" the lands erroneously excluded from the reservation. *Id.*, at 760. The Tribe contended that the 1901 agreement had not abrogated its usufructuary rights under the 1864 Treaty with respect to those lands.

We rejected the Tribe's argument and held that it had in fact relinquished its usufructuary rights to the lands at issue. We recognized that the 1864 Treaty had secured certain usufructuary rights to the Tribe, but we also recognized, based on an analysis of the specific terms of the Treaty, that the 1864 Treaty restricted those rights to the lands within the reservation. *Id.*, at 766–767. Because the rights were characterized as "exclusive," this "foreclose[d] the possibility that they were intended to have existence outside of the reservation." *Id.*, at 767. In other words, "because the right to hunt and fish reserved in the 1864 Treaty was an exclusive right to be exercised within the reservation, that right could not consistently survive off the reservation" on the lands the Tribe had sold. *Id.*, at 769–770. This understanding of the Tribe's usufructuary rights under the 1864 Treaty—that those rights were exclusive, on-reservation rights—informed our conclusion that the Klamath Tribe did not retain any usufructuary rights on the land that it ceded in the 1901 agreement, land that was not part of the reservation. In addition, we noted that there was nothing in the historical record of the 1901 agreement that suggested that the parties intended to change the background understanding of the scope of the usufructuary rights. *Id.*, at 772–773.

*Klamath* does not control this case. First, the Chippewa's usufructuary rights under the 1837 Treaty existed independently of land ownership; they were neither tied to a

reservation nor exclusive. In contrast to *Klamath*, there is no background understanding of the rights to suggest that they are extinguished when title to the land is extinguished. Without this background understanding, there is no reason to believe that the Chippewa would have understood a cession of a particular tract of land to relinquish hunting and fishing privileges on another tract of land. More importantly, however, the State's argument that similar language in two Treaties involving different parties has precisely the same meaning reveals a fundamental misunderstanding of basic principles of treaty construction. Our holding in *Klamath* was not based *solely* on the bare language of the 1901 agreement. Rather, to reach our conclusion about the meaning of that language, we examined the historical record and considered the context of the treaty negotiations to discern what the parties intended by their choice of words. This review of the history and the negotiations of the agreements is central to the interpretation of treaties. *El Al Israel Airlines, Ltd.* v. *Tsui Yuan Tseng*, 525 U. S., at 167. As we described above, an analysis of the history, purpose, and negotiations of *this Treaty* leads us to conclude that the Mille Lacs Band did not relinquish their 1837 Treaty rights in the 1855 Treaty.

## IV

Finally, the State argues that the Chippewa's usufructuary rights under the 1837 Treaty were extinguished when Minnesota was admitted to the Union in 1858. In making this argument, the State faces an uphill battle. Congress may abrogate Indian treaty rights, but it must clearly express its intent to do so. *United States* v. *Dion*, 476 U. S. 734, 738–740 (1986); see also *Washington* v. *Washington State Commercial Passenger Fishing Vessel Assn.*, 443 U. S., at 690; *Menominee Tribe* v. *United States*, 391 U. S. 404, 413 (1968). There must be "clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose

to resolve that conflict by abrogating the treaty." *United States* v. *Dion, supra,* at 740. There is no such "clear evidence" of congressional intent to abrogate the Chippewa Treaty rights here. The relevant statute—Minnesota's enabling Act—provides in relevant part:

> "[T]he State of Minnesota shall be one, and is hereby declared to be one, of the United States of America, and admitted into the Union on an equal footing with the original States in all respects whatever." Act of May 11, 1858, 11 Stat. 285.

This language, like the rest of the Act, makes no mention of Indian treaty rights; it provides no clue that Congress considered the reserved rights of the Chippewa and decided to abrogate those rights when it passed the Act. The State concedes that the Act is silent in this regard, Brief for Petitioners 36, and the State does not point to any legislative history describing the effect of the Act on Indian treaty rights.

With no direct support for its argument, the State relies principally on this Court's decision in *Ward* v. *Race Horse,* 163 U. S. 504 (1896). In *Race Horse,* we held that a Treaty reserving to a Tribe "'the right to hunt on the unoccupied lands of the United States, so long as game may be found thereon, and so long as peace subsists among the whites and Indians on the borders of the hunting districts'" terminated when Wyoming became a State in 1890. *Id.,* at 507 (quoting Art. 4 of the Treaty). This case does not bear the weight the State places on it, however, because it has been qualified by later decisions of this Court.

The first part of the holding in *Race Horse* was based on the "equal footing doctrine," the constitutional principle that all States are admitted to the Union with the same attributes of sovereignty (*i. e.,* on equal footing) as the original 13 States. See *Coyle* v. *Smith,* 221 U. S. 559 (1911). As relevant here, it prevents the Federal Government from impair-

ing fundamental attributes of state sovereignty when it admits new States into the Union. *Id.*, at 573. According to the *Race Horse* Court, because the treaty rights conflicted irreconcilably with state regulation of natural resources—"an essential attribute of its governmental existence," 163 U. S., at 516—the treaty rights were held an invalid impairment of Wyoming's sovereignty. Thus, those rights could not survive Wyoming's admission to the Union on "equal footing" with the original States.

But *Race Horse* rested on a false premise. As this Court's subsequent cases have made clear, an Indian tribe's treaty rights to hunt, fish, and gather on state land are not irreconcilable with a State's sovereignty over the natural resources in the State. See, *e. g., Washington* v. *Washington State Commercial Passenger Fishing Vessel Assn., supra;* see also *Antoine* v. *Washington,* 420 U. S. 194 (1975). Rather, Indian treaty rights can coexist with state management of natural resources. Although States have important interests in regulating wildlife and natural resources within their borders, this authority is shared with the Federal Government when the Federal Government exercises one of its enumerated constitutional powers, such as treaty making. U. S. Const., Art. VI, cl. 2. See, *e. g., Missouri* v. *Holland,* 252 U. S. 416 (1920); *Kleppe* v. *New Mexico,* 426 U. S. 529 (1976); *United States* v. *Winans,* 198 U. S., at 382–384; *United States* v. *Forty-three Gallons of Whiskey,* 93 U. S. 188 (1876). See also *Menominee Tribe* v. *United States, supra,* at 411, n. 12. Here, the 1837 Treaty gave the Chippewa the right to hunt, fish, and gather in the ceded territory free of territorial, and later state, regulation, a privilege that others did not enjoy. Today, this freedom from state regulation curtails the State's ability to regulate hunting, fishing, and gathering by the Chippewa in the ceded lands. But this Court's cases have also recognized that Indian treaty-based usufructuary rights do not guarantee the Indians "absolute freedom" from state regulation. *Oregon Dept. of Fish and Wildlife* v. *Klamath*

*Tribe,* 473 U. S., at 765, n. 16. We have repeatedly reaffirmed state authority to impose reasonable and necessary nondiscriminatory regulations on Indian hunting, fishing, and gathering rights in the interest of conservation. See *Puyallup Tribe* v. *Department of Game of Wash.,* 391 U. S. 392, 398 (1968); *Washington* v. *Washington State Commercial Passenger Fishing Vessel Assn.,* 443 U. S., at 682; *Antoine* v. *Washington, supra,* at 207–208. This "conservation necessity" standard accommodates both the State's interest in management of its natural resources and the Chippewa's federally guaranteed treaty rights. Thus, because treaty rights are reconcilable with state sovereignty over natural resources, statehood by itself is insufficient to extinguish Indian treaty rights to hunt, fish, and gather on land within state boundaries.[7]

We do not understand JUSTICE THOMAS to disagree with this fundamental conclusion. *Race Horse* rested on the premise that treaty rights are irreconcilable with state sovereignty. It is this conclusion—the conclusion undergirding the *Race Horse* Court's equal footing holding—that we have consistently rejected over the years. JUSTICE THOMAS' only disagreement is as to the scope of state regulatory authority. His disagreement is premised on a purported distinction between "rights" and "privileges." This Court has never used a distinction between rights and privileges

---

[7] THE CHIEF JUSTICE asserts that our criticism of *Race Horse* is inappropriate given our recent "reaffirm[ation]" of that case in *Oregon Dept. of Fish and Wildlife* v. *Klamath Tribe,* 473 U. S. 753 (1985). *Post,* at 219. Although we cited *Race Horse* in *Klamath,* we did not in so doing reaffirm the equal footing doctrine as a bar to the continuation of Indian treaty-based usufructuary rights. *Klamath* did not involve the equal footing doctrine. Rather, we cited *Race Horse* for the second part of its holding, discussed in the text, *infra,* at 206–208. See 473 U. S., at 773, n. 23. In any event, the *Race Horse* Court's reliance on the equal footing doctrine to terminate Indian treaty rights rested on foundations that were rejected by this Court within nine years of that decision. See *United States* v. *Winans,* 198 U. S. 371, 382–384 (1905).

to justify any differences in state regulatory authority. Moreover, as JUSTICE THOMAS acknowledges, *post*, at 223 (dissenting opinion), the starting point for any analysis of these questions is the treaty language itself. The Treaty must be interpreted in light of the parties' intentions, with any ambiguities resolved in favor of the Indians. *Winters* v. *United States*, 207 U. S., at 576–577. There is no evidence that the Chippewa understood any fine legal distinctions between rights and privileges. Moreover, under JUSTICE THOMAS' view of the 1837 Treaty, the guarantee of hunting, fishing, and gathering privileges was essentially an empty promise because it gave the Chippewa nothing that they did not already have.

The equal footing doctrine was only part of the holding in *Race Horse*, however. We also announced an alternative holding: The treaty rights at issue were not intended to survive Wyoming's statehood. We acknowledged that Congress, in the exercise of its authority over territorial lands, has the power to secure off-reservation usufructuary rights to Indian tribes through a treaty, and that "it would be also within the power of Congress to continue them in the State, on its admission into the Union." 163 U. S., at 515. We also acknowledged that if Congress intended the rights to survive statehood, there was no need for Congress to preserve those rights explicitly in the statehood Act. We concluded, however, that the particular rights in the Treaty at issue there— "the right to hunt on the unoccupied lands of the United States"—were not intended to survive statehood. *Id.*, at 514; see *id.*, at 514–515.

THE CHIEF JUSTICE reads *Race Horse* to establish a rule that "temporary and precarious" treaty rights, as opposed to treaty rights "which were 'of such a nature as to imply their perpetuity,'" are not intended to survive statehood. *Post*, at 219. But the "temporary and precarious" language in *Race Horse* is too broad to be useful in distinguishing rights that survive statehood from those that do not. In *Race*

*Horse,* the Court concluded that the right to hunt on federal lands was temporary because Congress could terminate the right at any time by selling the lands. 163 U. S., at 510. Under this line of reasoning, any right created by operation of federal law could be described as "temporary and precarious," because Congress could eliminate the right whenever it wished. In other words, the line suggested by *Race Horse* is simply too broad to be useful as a guide to whether treaty rights were intended to survive statehood.

The focus of the *Race Horse* inquiry is whether Congress (more precisely, because this is a treaty, the Senate) intended the rights secured by the 1837 Treaty to survive statehood. *Id.,* at 514–515. The 1837 Treaty itself defines the circumstances under which the rights would terminate: when the exercise of those rights was no longer the "pleasure of the President." There is no suggestion in the Treaty that the President would have to conclude that the privileges should end when a State was established in the area. Moreover, unlike the rights at issue in *Race Horse,* there is no fixed termination point to the 1837 Treaty rights. The Treaty in *Race Horse* contemplated that the rights would continue only so long as the hunting grounds remained unoccupied and owned by the United States; the happening of these conditions was "clearly contemplated" when the Treaty was ratified. *Id.,* at 509. By contrast, the 1837 Treaty does not tie the duration of the rights to the occurrence of some clearly contemplated event. Finally, we note that there is nothing inherent in the nature of reserved treaty rights to suggest that they can be extinguished by *implication* at statehood. Treaty rights are not impliedly terminated upon statehood. *Wisconsin* v. *Hitchcock,* 201 U. S. 202, 213–214 (1906); *Johnson* v. *Gearlds,* 234 U. S. 422, 439–440 (1914). The *Race Horse* Court's decision to the contrary—that Indian treaty rights were impliedly repealed by Wyoming's statehood Act—was informed by that Court's conclusion that the Indian treaty rights were inconsistent with state sovereignty

over natural resources and thus that Congress (the Senate) could not have intended the rights to survive statehood. But as we described above, Indian treaty-based usufructuary rights are not inconsistent with state sovereignty over natural resources. See *supra*, at 204–205. Thus, contrary to the State's contentions, *Race Horse* does not compel the conclusion that Minnesota's admission to the Union extinguished Chippewa usufructuary rights guaranteed by the 1837 Treaty.

Accordingly, the judgment of the United States Court of Appeals for the Eighth Circuit is affirmed.

*It is so ordered.*

CHIEF JUSTICE REHNQUIST, with whom JUSTICE SCALIA, JUSTICE KENNEDY, and JUSTICE THOMAS join, dissenting.

The Court holds that the various Bands of Chippewa Indians retain a usufructuary right granted to them in an 1837 Treaty. To reach this result, the Court must successively conclude that: (1) an 1850 Executive Order explicitly revoking the privilege as authorized by the 1837 Treaty was unlawful; (2) an 1855 Treaty under which certain Chippewa Bands ceded "all" interests to the land does not include the treaty right to come onto the land and hunt; and (3) the admission of Minnesota into the Union in 1858 did not terminate the discretionary hunting privilege, despite established precedent of this Court to the contrary. Because I believe that each one of these three conclusions is demonstrably wrong, I dissent.

I

I begin with the text of the Treaty negotiated in 1837. In that Treaty, the Chippewa ceded land to the United States in exchange for specified consideration. Article 1 of the Treaty describes the land ceded by the Chippewa to the United States. Article 2 of the 1837 Treaty provides:

"In consideration of the cession aforesaid, the United States agree to make to the Chippewa nation, annually, for the term of twenty years, from the date of the ratification of this treaty, the following payments.

"1. Nine thousand five hundred dollars, to be paid in money.

"2. Nineteen thousand dollars, to be delivered in goods.

"3. Three thousand dollars for establishing three blacksmiths shops, supporting the blacksmiths, and furnishing them with iron and steel.

"4. One thousand dollars for farmers, and for supplying them and the Indians, with implements of labor, with grain or seed; and whatever else may be necessary to enable them to carry on their agricultural pursuits.

"5. Two thousand dollars in provisions.

"6. Five hundred dollars in tobacco.

"The provisions and tobacco to be delivered at the same time with the goods, and the money to be paid; which time or times, as well as the place or places where they are to be delivered, shall be fixed upon under the direction of the President of the United States.

"The blacksmiths shops to be placed at such points in the Chippewa country as shall be designated by the Superintendent of Indian Affairs, or under his direction.

"If at the expiration of one or more years the Indians should prefer to receive goods, instead of the nine thousand dollars agreed to be paid to them in money, they shall be at liberty to do so. Or, should they conclude to appropriate a portion of that annuity to the establishment and support of a school or schools among them, this shall be granted them." 7 Stat. 536–537.

Thus, in exchange for the land cessions, the Chippewa agreed to receive an annuity payment of money, goods, and the implements necessary for creating blacksmith's shops and farms, for a limited duration of 20 years.

Articles 3 and 4 of the Treaty deal with cash payments to persons not parties to this suit, but Article 5 is involved here. As the Court notes, there was some discussion during the treaty negotiations that the Chippewa wished to preserve some right to hunt in the ceded territory. See *ante*, at 176. The United States agreed to this request to some extent, and the agreement of the parties was embodied in Article 5 of the Treaty, which provides that:

> "The privilege of hunting, fishing, and gathering the wild rice, upon the lands, the rivers and the lakes included in the territory ceded, is guarantied to the Indians, during the pleasure of the President of the United States." 7 Stat. 537.

As the Court also notes, the Chippewa were aware that their right to come onto the ceded land was not absolute— the Court quotes the statement of Governor Dodge to the Chippewa that he would "'make known to your Great Father, your request to be permitted to make sugar, on the lands; and you will be allowed, during his pleasure, to hunt and fish on them.'" *Ante*, at 176; App. 46 (1837 Journal of Treaty Negotiations).

Thus, the Treaty by its own plain terms provided for a *quid pro quo:* Land was ceded in exchange for a 20-year annuity of money and goods. Additionally, the United States granted the Chippewa a quite limited "privilege" to hunt and fish, "guarantied . . . during the pleasure of the President." Art. 5, 7 Stat. 537.

## II

In 1850, President Taylor expressly terminated the 1837 Treaty privilege by Executive Order. The Executive Order provides:

> "The privileges granted temporarily to the Chippewa Indians of the Mississippi by the Fifth Article of the Treaty made with them on the 29th of July 1837, 'of hunting, fishing and gathering the wild rice, upon the

lands, the rivers and the lakes included in the territory ceded' by that treaty to the United States ... are hereby revoked; and all of the said Indians remaining on the lands ceded as aforesaid, are required to remove to their unceded lands." App. to Pet. for Cert. 565.

In deciding that this seemingly ironclad revocation was not effective as a matter of law, the Court rests its analysis on four findings. First, the Court notes that the President's power to issue the order must stem either from an Act of Congress or the Constitution itself. Second, the Court determines that the Executive Order was a "removal order." Third, the Court finds no authority for the President to order the Chippewa to remove from the ceded lands. And fourth, the Court holds that the portion of the Executive Order extinguishing the hunting and fishing rights is not severable from the "removal order" and thus also was illegal. I shall address each of these dubious findings in turn.

The Court's first proposition is the seemingly innocuous statement that a President's Executive Order must be authorized by law in order to have any legal effect. In so doing, the Court quotes our decision in *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, 585 (1952), which held that President Truman's seizure of the steel mills by Executive Order during the Korean War was unlawful. However, the Court neglects to note that treaties, every bit as much as statutes, are sources of law and may also authorize Executive actions. See *Dames & Moore* v. *Regan,* 453 U. S. 654, 680 (1981). In *Dames & Moore,* we noted that where the President acts with the implied consent of Congress in his Executive actions, "he exercises not only his own powers but also those delegated by Congress," and that such an action was entitled to high deference as to its legality. *Id.,* at 668. This case involves an even stronger case for deference to Executive power than *Dames & Moore,* in which Presidential power under an Executive agreement was impliedly authorized by Congress, because the Executive Order in this

case was issued pursuant to a Treaty ratified by the advice and consent of the Senate, and thus became the supreme law of the land. See U. S. Const., Art. VI; *United States* v. *Belmont,* 301 U. S. 324 (1937). The Court's contrary conclusion is simply wrong.

The Court's second assumption is that the Executive Order was a "removal order"—that its primary purpose was the removal of the Chippewa. This assumption rests upon scattered historical evidence that, in the Court's view, "[t]he officials charged with implementing this order understood it primarily as a removal order, and they proceeded to implement it accordingly." *Ante,* at 179. Regardless of what the President's remote frontier agents may have thought, the plain meaning of the *text* of President Taylor's order can only support the opposite conclusion. The structure of the Executive Order is not that of a removal order, with the revocation of the hunting privileges added merely as an afterthought. Instead, the first part of the order (not to mention the bulk of its text) deals with the extinguishment of the Indians' privilege to enter onto the lands ceded to the United States and hunt. Only then (and then only in its final five words) does the Executive Order require the Indians to "remove to their unceded lands." App. to Pet. for Cert. 565 (Exec. Order, Feb. 6, 1850).

If the structure and apparent plain meaning of the Executive Order reveal that the order was primarily a revocation of the privilege to hunt during the President's pleasure, what then should we make of the fact that the officials charged with "implementing" the order viewed their task as primarily effecting removal? The answer is simple. First, the bulk of the Executive Order that terminates the hunting privilege was self-executing. Second, while the President could terminate the legal right (*i. e.,* the privilege to enter onto the ceded lands and hunt) without taking enforcement action, a removal order *would* require actual implementation. The historical evidence cited by the Court is best

understood thus as an implementation of President Taylor's unequivocal (and legally effective) termination of the usufructuary privileges. But while the removal portion may have required implementation to be effective, this cannot turn the Executive Order into a "removal order." And even if the President's agents viewed the order as a removal order (a proposition for which the historical evidence is far more ambiguous than the Court admits), their interpretation is not binding on this Court; nor should it be, since the agents had nothing to do with the bulk of the order which terminated the treaty privileges.

The Court's third finding is that the removal portion of the order is invalid because President Taylor had no authority to order removal. Although the Court sensibly concludes that the Removal Act of 1830 is inapplicable to this case, it then curiously rejects the notion that the 1837 Treaty authorizes removal, largely on the grounds that "[t]he Treaty makes no mention of removal." *Ante*, at 189. The Court is correct that the Treaty does not *mention* removal, but this is because the Treaty was essentially a deed of conveyance— it transferred land to the United States in exchange for goods and money. After the Treaty was executed and ratified, the ceded lands belonged to the United States, and the only real property interest in the land remaining to the Indians was the privilege to come onto it and hunt during the pleasure of the President. When the President terminated that privilege (a legal act that the Court appears to concede he had a right to make, *ante*, at 193–194), he terminated the Indians' right to come onto the ceded lands and hunt. The Indians had no legal right to remain on the ceded lands for that purpose, and the removal portion of the order should be viewed in this context. Indeed, the Indians then had no legal rights at all with respect to the ceded lands, in which all title was vested in the United States. And this Court has long held that the President has the implied power to administer the public lands. See, *e. g.*, *United States* v. *Mid-*

*west Oil Co.*, 236 U. S. 459 (1915). Dealing with persons whose legal right to come onto the lands and hunt had been extinguished would appear to fall squarely under this power. Whether the President chose to enforce his revocation through an order to leave the land or the ambiguous lesser "measures to make sure that the Chippewa were not hunting, fishing, or gathering" proposed by the Court, *ante*, at 194, n. 5, is not ours to second-guess a century and a half later. Indeed, although the Court appears to concede that the President had the power to enforce the revocation order, it is difficult to imagine what steps he could have taken to prevent hunting other than ordering the Chippewa not to come onto the land for that purpose. The ceded lands were not a national park, nor did the President have an army of park rangers available to guard Minnesota's wildlife from Chippewa poachers. Removal was the only viable option in enforcing his power under the Treaty to terminate the hunting privilege. Thus, in my view, the final part of the Executive Order discussing removal was lawful.[1]

---

[1] The Court's assumption that "any general presumption about the legality of executive action runs into the principle that treaty ambiguities are to be resolved in favor of the Indians," *ante*, at 194, n. 5, illogically confuses the difference between executive authority and a principle of treaty construction. The principle of *Winters* v. *United States,* 207 U. S. 564, 567–577 (1908), and *County of Yakima* v. *Confederated Tribes and Bands of Yakima Nation,* 502 U. S. 251, 269 (1992), that ambiguities in treaties are to be resolved in favor of the Indians, is only relevant to determining the intent of the *parties to a treaty* (that is the United States and the Indian tribe), and stems from the idea that in determining the intent of the parties, Indian tribes should be given the benefit of the doubt as against the United States in cases of ambiguous treaty provisions because the United States was presumptively a more sophisticated bargainer. See *Washington* v. *Washington State Commercial Passenger Fishing Vessel Assn.,* 443 U. S. 658, 675–676 (1979). But the determination of whether the President has power to enforce his revocation by removal is irrelevant to the intent of the parties to the treaty (the United States and the Chippewa in this case) and presents instead an issue of separation of powers (between the President and the Congress).

The fourth element essential to today's holding is the conclusion that if the final part of the Executive Order requiring removal were not authorized, the bulk of the order would fail as not severable.  Because this is the first time we have had occasion to consider the severability of Executive Orders, the Court first assumes that the standards for severability of statutes also apply to the severability of Executive Orders.  Next, the Court determines to seek the "legislative intent" of President Taylor in issuing the order.  *Ante*, at 191.  And finally, the Court concludes that President Taylor would not have issued the Executive Order in the absence of a removal provision, because the 1850 order embodied a coherent policy of Indian removal.  As noted above, this approach to the Executive Order stands it on its head— the order *first* extinguishes the hunting privilege and only then—in its last five words—orders removal.

But even if I were to assume that the President were without authority to order removal, I would conclude that the removal provision is severable from that terminating the treaty privileges.  There is no dispute that the President had authority under the 1837 Treaty to terminate the treaty privileges.  We have long held that "[w]hen the President acts pursuant to an express or implied authorization from Congress, . . . the executive action 'would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.'"  *Dames & Moore* v. *Regan*, 453 U. S., at 668 (quoting *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S., at 637 (Jackson, J., concurring)).  Against this deferential standard, the Court musters little more than conjecture and inference, reinforced by its upside-down reading of the Executive Order's plain text.  Not only does the Court invert the plain meaning of the Executive Order, it inverts the proper standard of review.  Given the deference we are to accord this valid action made pursuant to a treaty, the order's termination of

216

the treaty privileges should be sustained unless the Chippewa are able to clearly demonstrate that President Taylor would *not* have terminated them without a removal order. But there is no such evidence, and in the absence of evidence challenging the "strongest of presumptions and the widest latitude of judicial interpretation" that we are required to afford President Taylor's actions, we have only the Court's misguided excursion into historiographical clairvoyance. Accordingly, I would conclude, if necessary, that the termination portion of the Executive Order is severable.

Rather than engage in the flawed analysis put forward by the Court, I would instead hold that the Executive Order constituted a valid revocation of the Chippewa's hunting and fishing privileges. Pursuant to a Treaty, the President terminated the Indians' hunting and fishing privileges in an Executive Order which stated, in effect, that the privilege to come onto federal lands and hunt was terminated, and that the Indians move themselves from those lands.

No party has questioned the President's power to terminate the hunting privilege; indeed, the only other evidence in the record of a President's intent regarding the Executive Order is a 1938 letter from President Franklin Roosevelt to one of the Chippewa, in which he stated his understanding that the Indians had "temporarily" enjoyed "the right to hunt and fish on the area ceded by them until such right was revoked by the President" in the 1850 Executive Order. App. to Pet. for Cert. 575 (letter from President Roosevelt to Whitebird, Mar. 1, 1938). President Roosevelt went on to add that since the right to hunt and fish was terminated in 1850, the Chippewa "now have no greater right to hunt or fish on the ceded area . . . than do the other citizens of the State. Therefore, the Indians who hunt or fish . . . are amenable to the State game laws and are subject to arrest and conviction [f]or violation thereof." *Id.*, at 576.

President Roosevelt's letter reflects the settled expectations of the President, in whose office the discretion to terminate the privilege granted in Article 5 of the 1837 Treaty was vested, that the 1850 Executive Order was a valid termination of the treaty privileges. And because the 1837 Treaty, in conjunction with the Presidential power over public lands, gave the President the power to order removal in conjunction with his termination of the hunting rights, the Court's severability analysis is unnecessary. In sum, there is simply no principled reason to invalidate the 150-year-old Executive Order, particularly in view of the heightened deference and wide latitude that we are required to give orders of this sort.

## III

Although I believe that the clear meaning of the Executive Order is sufficient to resolve this case, and that it is unnecessary to address the Court's treatment of the 1855 Treaty and the 1858 admission of Minnesota to the Union, I shall briefly express my strong disagreement with the Court's analysis on these issues also.

As the Court notes, in 1855, several of the Chippewa Bands agreed, in exchange for further annuity payments of money and goods, to "fully and entirely relinquish and convey to the United States, any and all right, title, and interest, of whatsoever nature the same may be, which they now have in, and to any other lands in the Territory of Minnesota or elsewhere." 10 Stat. 1166. The plain meaning of this provision is a relinquishment of the Indians of "all" rights to the land. The Court, however, interprets this provision in a manner contrary to its plain meaning by first noting that the provision does not mention "usufructuary" rights. It argues, citing examples, that since the United States "had the sophistication and experience to use express language for the abrogation of treaty rights," *ante,* at 195, but did not mention the 1837 Treaty rights in drafting this

language,[2] it perhaps did not intend to extinguish those rights, thus creating an interpretation at odds with the Treaty's language. Then, using our canons of construction that ambiguities in treaties are often resolved in favor of the Indians, it concludes that the Treaty did not apply to the hunting rights.

I think this conclusion strained, indeed. First, the language of the Treaty is so broad as to encompass *"all"* interests in land possessed or claimed by the Indians. Second, while it is important to the Court that the Treaty "is devoid of any language expressly mentioning—much less abrogating—usufructuary rights," *ibid.*, the definition of "usufructuary rights" explains further why this is so. Usufructuary rights are "a real right of limited duration on the property of another." See Black's Law Dictionary 1544 (6th ed. 1990). It seems to me that such a right would fall clearly under the sweeping language of the Treaty under any reasonable interpretation, and that this is not a case where "even 'learned lawyers' of the day would probably have offered differing interpretations of the [treaty language]." Cf. *Washington* v. *Washington State Commercial Passenger Fishing Vessel Assn.*, 443 U. S. 658, 677 (1979). And third, although the Court notes that in other treaties the United States sometimes expressly mentioned cessions of usufructuary rights, there was no need to do so in this case, because the settled expectation of the United States was that the 1850 Executive Order had terminated the hunting rights of the Chippewa. Thus, rather than applying the plain and unequivocal language of the 1855 Treaty, the Court holds that "all" does not in fact mean "all."

---

[2] One notices the irony that where the President chose to explicitly eliminate the 1837 Treaty rights, the Court finds this specificity subsumed in the "removal order," and invalidates it as well.

## IV

Finally, I note my disagreement with the Court's treatment of the equal footing doctrine, and its apparent overruling *sub silentio* of a precedent of 103 years' vintage. In *Ward* v. *Race Horse*, 163 U. S. 504 (1896), we held that a Treaty granting the Indians "the right to hunt on the unoccupied lands of the United States, so long as game may be found thereon, and so long as peace subsists among the whites and the Indians on the borders of the hunting districts," did not survive the admission of Wyoming to the Union since the treaty right was "temporary and precarious." *Id.*, at 515.

But the Court, in a feat of jurisprudential legerdemain, effectively overrules *Race Horse sub silentio*. First, the Court notes that Congress may only abrogate Indian treaty rights if it clearly expresses its intent to do so. Next, it asserts that Indian hunting rights are not irreconcilable with state sovereignty, and determines that "because treaty rights are reconcilable with state sovereignty over natural resources, statehood by itself is insufficient to extinguish Indian treaty rights to hunt, fish, and gather on land within state boundaries." *Ante*, at 205. And finally, the Court hints that *Race Horse* rested on an incorrect premise—that Indian rights were inconsistent with state sovereignty.

Without saying so, this jurisprudential bait-and-switch effectively overrules *Race Horse*, a case which we reaffirmed as recently as 1985 in *Oregon Dept. of Fish and Wildlife* v. *Klamath Tribe*, 473 U. S. 753 (1985). *Race Horse* held merely that treaty rights which were only "temporary and precarious," as opposed to those which were "of such a nature as to imply their perpetuity," do not survive statehood.[3] 163 U. S.,

---

[3] The Court maintains that this reading of *Race Horse* is overbroad and would render any right created by operation of federal law "temporary and precarious." *Ante*, at 206. Nothing could be further from the truth. The outer limit of what constitutes a "temporary and precarious" right is not before the Court (nor, since *Race Horse* is apparently overruled, will it ever

at 515. Here, the hunting privileges were clearly, like those invalidated in *Race Horse*, temporary and precarious: The privilege was only guaranteed "during the pleasure of the President"; the legally enforceable annuity payments themselves were to terminate after 20 years; and the Indians were on actual notice that the President might end the rights in the future, App. 78 (1837 Journal of Treaty Negotiations).

Perhaps the strongest indication of the temporary nature of the treaty rights is presented unwittingly by the Court in its repeated (and correct) characterizations of the rights as "usufructuary." As noted *supra*, at 218, usufructuary rights are *by definition* "of limited duration." Black's Law Dictionary, *supra*, at 1544. Thus, even if the Executive Order is invalid; and even if the 1855 Treaty did not cover the usufructuary rights: Under *Race Horse*, the temporary and precarious treaty privileges were eliminated by the admission of Minnesota to the Union on an equal footing in 1858. Today the Court appears to invalidate (or at least substantially limit) *Race Horse*, without offering any principled reason to do so.

V

The Court today invalidates for no principled reason a 149-year-old Executive Order, ignores the plain meaning of a 144-year-old treaty provision, and overrules *sub silentio* a 103-year-old precedent of this Court. I dissent.

JUSTICE THOMAS, dissenting.

I join THE CHIEF JUSTICE's dissent, but also write separately because contrary to the majority's assertion, in dicta,

---

be), but the hunting privileges granted in *Race Horse* and by the 1837 Treaty in this case reveal themselves to be "temporary and precarious" by their plain text: The privilege in *Race Horse* ended upon occupation of the hunting districts or the outbreak of hostilities, while the privilege in this case lasted only during the pleasure of the President. Both rights were temporary and precarious, as neither was guaranteed, either expressly or impliedly, in perpetuity.

*ante,* at 204, our prior cases do not dictate the conclusion that the 1837 Treaty curtails Minnesota's regulatory authority.

As the Court has ruled today that the Chippewa retain the privilege to hunt, fish, and gather on the land they ceded in the 1837 Treaty, the question of the scope of the State's regulatory power over the Chippewas' exercise of those privileges assumes great significance—any limitations that the Federal Treaty may impose upon Minnesota's sovereign authority over its natural resources exact serious federalism costs. The questions presented, however, do not require the Court to decide whether the 1837 Treaty limits the State's regulatory authority in any way. All that they require is a judgment as to whether the usufructuary privileges at issue survive three potentially extinguishing events: President Taylor's 1850 Executive Order, the 1855 Treaty, and Minnesota's admission to the Union in 1858.

The Court nevertheless offers the following observation:

> "Here, the 1837 Treaty gave the Chippewa the right to hunt, fish, and gather in the ceded territory *free of territorial, and later state, regulation,* a privilege that others did not enjoy. Today, this freedom from state regulation *curtails the State's ability to regulate hunting, fishing, and gathering by the Chippewa in the ceded lands." Ante,* at 204 (emphases added).

In light of the importance of this federalism question, the Court should not pass on it, even in dicta, without the benefit of the parties' briefing and argument. But as the Court has done so, I think it important to explain my disagreement with the italicized propositions.

The plain language of the 1837 Treaty says nothing about territorial, let alone future state, regulation. The historical evidence that the Court reviews, *ante,* at 176–178, to the extent that it is relevant, is likewise silent as to whether the Chippewa expected to be subject to any form of regulation

in the exercise of their reserved treaty privileges. The historical evidence certainly indicates that the Chippewa desired the privilege of access to the land they were ceding. But the 1837 Journal of Treaty Negotiations does not show that the Chippewa demanded access to the land on any particular terms. See App. 70–78.

Indeed, the Court retreats from its assertion that the 1837 Treaty gave the Chippewa an unlimited right to hunt, fish, and gather free from regulation when it states: "We have repeatedly reaffirmed state authority to impose reasonable and necessary nondiscriminatory regulations on Indian hunting, fishing, and gathering rights in the interest of conservation." *Ante*, at 205. If the 1837 Treaty gives the Chippewa a right to be free from state regulation, why may Minnesota impose any regulations, reasonable and necessary or otherwise? The Court's answer to that question is that our prior decisions have established that Indians never have "'absolute freedom,'" *ante*, at 204, from state regulation, no matter what a treaty might say; rather, Indians' hunting, fishing, and gathering activities are limited by those state regulations which are necessary for ensuring the conservation of natural resources.

To be sure, Indians do not have absolute freedom from state regulation of their off-reservation activities. Indeed, the general rule is that the off-reservation activities of Indians are subject to a State's nondiscriminatory laws, absent express federal law to the contrary. See, *e. g., Oregon Dept. of Fish and Wildlife* v. *Klamath Tribe*, 473 U. S. 753, 765, n. 16 (1985); *New Mexico* v. *Mescalero Apache Tribe*, 462 U. S. 324, 335, n. 18 (1983). The majority, however, overlooks the fact that the scope of a State's regulatory authority depends upon the language of the treaty in question. At a *minimum*, States may issue and enforce those regulations of Indians' off-reservation usufructuary activities that are necessary in the interest of conservation. Our decisions suggest that state regulatory authority is so limited when, with

the treaty in question, the Indians reserved a *right* to fish, hunt, or gather on ceded lands. But it is doubtful that the so-called "conservation necessity" standard applies in cases, such as this one, where Indians reserved no more than a *privilege* to hunt, fish, and gather.

The conservation necessity standard appears to have its origin in *Tulee* v. *Washington*, 315 U. S. 681 (1942). In the 1859 Treaty with the Yakima Indians, the Yakima reserved "'the right of taking fish at all usual and accustomed places, in common with citizens of the Territory.'" *Id.*, at 683 (quoting 12 Stat. 953). The Court held that Washington State had the "power to impose on Indians, equally with others, such restrictions of a purely regulatory nature concerning the time and manner of fishing outside the reservation *as are necessary for the conservation of fish*," but that the Treaty foreclosed "the state from charging the Indians a fee of the kind in question." 315 U. S., at 684 (emphasis added). Its conclusion was driven by the language of the Treaty as well as the report of the treaty negotiations and what it revealed to be the Yakimas' understanding of the Treaty—to preserve their right "to hunt and fish *in accordance with the immemorial customs of their tribes.*" *Ibid.* (emphasis added).[1] Subsequent decisions evaluating state regulation by the conservation necessity standard similarly focused upon the language of the Treaty or agreement at issue and the Indians' understanding of the Treaty as revealed by the historical evidence. See *Washington* v. *Washington State Commercial Passenger Fishing Assn.*, 443 U. S. 658, 665–669, 674–685 (1979) (recognizing that the Court had construed the same Treaty language several times before, and emphasizing

---

[1] A prior case interpreting the same 1859 Treaty held that the language fixed in the land an easement for the Yakima so that they could cross private property to fish in the Columbia River. *United States* v. *Winans*, 198 U. S. 371, 381–382 (1905). But the Court also wrote that the Treaty did not "restrain the State unreasonably, *if at all*, in the regulation of the right." *Id.*, at 384 (emphasis added).

the historical background against which the Treaty at issue was signed); *Puyallup Tribe* v. *Department of Game of Wash.*, 391 U. S. 392, 395, 397 (1968) (involving treaty language almost identical to that at issue in *United States* v. *Winans*, 198 U. S. 371 (1905), and *Tulee, supra*); see also *Antoine* v. *Washington*, 420 U. S. 194, 206 (1975) (favorably comparing the somewhat different language of the agreement at issue with the language of the Treaties at issue in *Winans* and *Puyallup*). Most important, all the cases that the majority cites in support of the proposition that States may enforce against Indians in their exercise of off-reservation usufructuary activities only those regulations necessary for purposes of conservation, *ante*, at 204–205, involved the same or substantially similar treaty language reserving a *right* to hunt or fish. And all but *Antoine* also provided that the Indians could exercise their reserved rights at the usual and accustomed places.

In *New York ex rel. Kennedy* v. *Becker*, 241 U. S. 556 (1916), the Court considered significantly different language. The Big Tree Treaty of 1797, as the agreement was known, provided that the Seneca were to retain "the *privilege* of fishing and hunting on the said tract of land" conveyed by the agreement. 7 Stat. 602 (emphasis added); see also 241 U. S., at 562 (quoting the reservation clause). The Court characterized the Senecas' claim as one "sought to be maintained in derogation of the sovereignty of the State." *Ibid.* In rejecting such a claim, it stated:

> "[I]t can hardly be supposed that the thought of the Indians was concerned with the necessary exercise of inherent power under modern conditions for the preservation of wild life. But the existence of the sovereignty of the State was well understood, and this conception involved all that was necessarily implied in that sovereignty, whether fully appreciated or not. We do not think that it is a proper construction of the reservation in the conveyance to regard it as an attempt either to

reserve sovereign prerogative or so to divide the inherent power of preservation as to make its competent exercise impossible. Rather we are of the opinion that the clause is fully satisfied by considering it a reservation of a privilege of fishing and hunting upon the granted lands *in common with the grantees, and others to whom the privilege might be extended, but subject nevertheless to that necessary power of appropriate regulation, as to all those privileged, which inhered in the sovereignty of the State over the lands where the privilege was exercised.*" *Id.,* at 563–564 (emphasis added).

The only fair reading of *Kennedy* is that the Treaty reserved for the Seneca a privilege in common with all persons to whom the State chose to extend fishing and hunting privileges. The Court did not indicate that the Treaty limited New York's regulatory authority with respect to the Seneca in any way. See *id.,* at 564 (the treaty privilege was subject to "that necessary power of appropriate regulation, *as to all those privileged,* which inhered in the sovereignty of the State over the lands where the privilege was exercised" (emphasis added)). Of course, then, what was "appropriate" state regulation as applied to non-Indians was "appropriate" regulation as applied to the Seneca. Cf. *Puyallup Tribe, supra,* at 402, n. 14 ("The measure of the legal propriety of [regulations that are to be measured by the conservation necessity standard] is . . . distinct from the federal constitutional standard concerning the scope of the police power of a State").[2]

---

[2] As already noted, *supra,* at 222, the Court has said that "[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe* v. *Jones,* 411 U. S. 145, 148–149 (1973) (State of New Mexico permitted to tax off-reservation activities of Tribe as they would any non-Indians). In support of that proposition in *Mescalero,* the Court cited the *Puyallup Tribe* and *Tulee* decisions, but not *Kennedy.* A possible explanation is

The 1837 Treaty at issue here did not reserve "the right of taking fish at all usual and accustomed places, in common with citizens of the Territory" like those involved in *Tulee* and *Puyallup Tribe*. Rather, it provided:

> "The *privilege* of hunting, fishing, and gathering the wild rice, upon the lands, the rivers and the lakes included in the territory ceded, is guarantied to the Indians, during the pleasure of the President of the United States." 1837 Treaty with the Chippewa, 7 Stat. 537 (emphasis added).

This language more closely resembles the language of the Big Tree Treaty at issue in *Kennedy*. Although Minnesota's regulatory authority is not at issue here, in the appropriate case we must explain whether reserved treaty *privileges* limit States' ability to regulate Indians' off-reservation usufructuary activities in the same way as a treaty reserving *rights*.[3] This is especially true with respect to the privileges reserved by the Chippewa in the 1837 Treaty, which, as THE CHIEF JUSTICE explains, *ante*, at 219–220 (dissenting opinion), were clearly of a temporary and precarious nature.

---

that the Treaties at issue in *Puyallup Tribe* and *Tulee* provided express federal law to the contrary, while the Treaty in *Kennedy* did not.

[3] Various representatives of the United States have previously taken the position that treaty rights are "more substantial vested rights than treaty reserved privileges." Holt, Can Indians Hunt in National Parks?, 16 Envtl. L. 207, 236–238 (1986) (citing letters from the Department of Agriculture, Department of the Interior, and the Department of Justice to that effect).