241 P.3d 399 (2010)
STATE of Washington, Respondent,
v.
Loretta L. ERIKSEN, Petitioner.
No. 80653-5.
Supreme Court of Washington, En Banc.
Argued May 12, 2009.
Decided October 14, 2010.
*400 William Joseph Johnston, Attorney at Law, Bellingham, WA, for Petitioner.
Ann Lindsay Stodola, Attorney at Law, Bellingham, WA, for Respondent.
Mary Michelle Neil, Attorney at Law, Bellingham, WA, amicus counsel for Lummi Nation.
SANDERS, J.
¶ 1 A Lummi Nation tribal police officer, while patrolling the reservation, witnessed a car drift across the center divider with its high-beam headlights activated. Did the officer have authority to pursue this vehicle across the reservation border and then detain the non-Indian driver on suspicion of driving under the influence (DUI) until authorities with jurisdiction to arrest arrived? This question is an extension of the issue we faced in State v. Schmuck, 121 Wash.2d 373, 850 P.2d 1332 (1993), where we held that tribal officers have authority to stop and detain non-Indian offenders on-reservation *401 until state authorities could assume custody. We hold today that tribal officers have authority to continue fresh pursuit of motorists who break traffic laws on the reservation and subsequently drive beyond the reservation boundaries. We affirm the trial court.

FACTS
¶ 2 While patrolling the Lummi reservation sometime after 1:30 a.m. on August 10, 2005, Officer Mike McSwain of the Lummi Nation Police Department (LNPD) observed a vehicle coming toward him on Slater Road with its high beams glaring. McSwain flashed his headlights to remind the driver (later identified as Loretta Eriksen) to dim the high beams, but the driver did not comply. McSwain slowed his patrol car to prepare to turn around and pursue the car.[1] But "as the vehicle approached, it drifted across the center line into my lane of travel coming within a couple feet of my vehicle," McSwain testified. Clerk's Papers (CP) at 23 (Tr. (Jan. 26, 2006) at 8). "At that point, you know, I came to an immediate stop, getting ready to swerve in case it continued." Id. As the vehicle drifted back into its lane, McSwain observed a second car following very closely behind the drifting vehicle. McSwain turned his patrol car around, activated his emergency lights, and began pursuing both cars westbound on Slater Road.
¶ 3 After traveling approximately a quarter mile the cars turned into a gas station located off the Lummi reservation. The second car broke off, went around the west side of the station, and disappeared from McSwain's line of sight. McSwain stopped behind the first car and observed the passenger exit the vehicle and run to the driver's side, while the driversoon to be identified as Eriksenhopped over the center console and into the passenger's seat. McSwain commanded Eriksen and the passenger to stop moving and put their hands where he could see them. Then he called for backup. Two LNPD patrol cars arrived less than five minutes later.[2]
¶ 4 McSwain then asked Eriksen why she had jumped into the passenger seat. In slightly slurred speech, Eriksen said she had not been driving. McSwain warned her about making false statements. He also observed that her eyes were watery and bloodshot and she smelled strongly of alcohol. McSwain determined neither woman was a tribal member, so he contacted the Whatcom County Sheriff's Office, which is standard procedure for stops involving nontribal members.
¶ 5 McSwain asked Eriksen to step out of her car and follow him to his patrol vehicle. He noticed that "she was having difficulty keeping her balance and walking" and that "she began to sway back and forth ... [as he] started to explain to her what was going on...." CP at 32 (Tr. (Jan. 26, 2006) at 17). McSwain advised Eriksen that she would be detained but not arrested and a sheriff's deputy would make a final determination. McSwain did not administer any sobriety tests and testified Eriksen would not take any tests. He then handcuffed Eriksen and placed her in the back of his patrol car until a Whatcom County sheriff's deputy arrived. McSwain remained at the scene until the deputy arrested Eriksen for DUI.
¶ 6 The trial court convicted Eriksen of DUI and denied her motion for reconsideration. The court reasoned that the Lummi Nation's inherent sovereign powerwhich includes enforcing internal criminal lawsauthorizes tribal police to continue pursuing *402 offenders who drive off the reservation. The court concluded that it would be inconsistent with this power, and Washington's policy of authorizing officers to cross jurisdictional boundaries when in "fresh pursuit," for "somebody [to] just cross the line and be scot-free." Verbatim Report of Proceedings (VRP) (Aug. 20, 2007) at 40-41. We granted Eriksen's motion for discretionary review to resolve this issue of first impression.

ANALYSIS

I. Tribal Authority
¶ 7 Jurisdictional disputes on Indian reservations involve overlapping federal, state, and tribal jurisdiction. Schmuck, 121 Wash.2d at 380, 850 P.2d 1332.[3] Jurisdiction is a matter of law that we review de novo when the location of a crime is not in dispute.[4]State v. Waters, 93 Wash.App. 969, 976, 971 P.2d 538 (1999) (citing State v. L.J.M., 129 Wash.2d 386, 396, 918 P.2d 898 (1996)).
¶ 8 Whether a tribe has authority to stop and detain an individual necessarily involves an analysis of the limited sovereignty the tribe retains. Schmuck, 121 Wash.2d at 380, 850 P.2d 1332. To determine whether tribes retain their sovereign powers, we must "look[ ] to the character of the power that the tribe seeks to exercise, not merely the location of events." John v. Baker, 982 P.2d 738, 752 (Alaska 1999). Tribes are "unique aggregations possessing attributes of sovereignty over both their members and their territory." United States v. Mazurie, 419 U.S. 544, 557, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975). "Intrinsic in this sovereignty is the power of a tribe to create and administer a criminal justice system." Ortiz-Barraza v. United States, 512 F.2d 1176, 1179 (9th Cir. 1975).
¶ 9 However, Indian tribes have a unique dependent relationship with the United States. See, e.g., Duro v. Reina, 495 U.S. 676, 697, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990). Because of this dependent status, the sovereign authority possessed by Indian tribes is less than that of nondependent sovereigns. Nevada v. Hicks, 533 U.S. 353, 378-79, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001) (Souter, J., concurring); Duro, 495 U.S. 676, 110 S.Ct. 2053; Montana v. United States, 450 U.S. 544, 564, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981); Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 195, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978). Thus, the United States Supreme Court has held that tribal sovereignty over nonmembers is not an inherent power retained by Indian tribes. See, e.g., South Dakota v. Bourland, 508 U.S. 679, 695 n. 15, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993) ("tribal sovereignty over nonmembers `cannot survive without express congressional delegation'" (quoting Montana, 450 U.S. at 564, 101 S.Ct. 1245)).
¶ 10 The United States Supreme Court has held that the dependent nature of Indian tribes has implicitly divested some powers traditionally associated with sovereignty. Hicks, 533 U.S. at 378-79, 121 S.Ct. 2304 (Souter, J., concurring); Duro, 495 U.S. 676, 110 S.Ct. 2053; Montana, 450 U.S. at 564, 101 S.Ct. 1245; Oliphant, 435 U.S. at 195, 98 S.Ct. 1011. This divestiture includes all criminal jurisdiction and nearly all civil jurisdiction over non-Indians. However, powers lost through dependent sovereign status can be restored through positive federal law, such as treaty provisions or acts of Congress.
*403 ¶ 11 The United States Supreme Court has limited tribal authority over non-Indians. In Oliphant, the Supreme Court stated, "We granted [review of the present case] to decide whether Indian tribal courts have criminal jurisdiction over non-Indians. We decide that they do not." 435 U.S. at 195, 98 S.Ct. 1011. In Montana, the Court held that the Crow Tribe could not prohibit on-reservation fishing and hunting by non-Indians. The Court endorsed the "general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." Montana, 450 U.S. at 565, 101 S.Ct. 1245 (citing Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 147, 3 L.Ed. 162 (1810)). The Court noted two exceptions to this rule: (1) tribes may regulate the activities of nonmembers who enter consensual relationships with the tribe and (2) tribes may exercise civil authority over non-Indians' conduct on land "within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." Id. at 565-66, 101 S.Ct. 1245.
¶ 12 The Court has since held that the Montana exceptions are to be narrowly construed. In Strate v. A-1 Contractors, 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997), the Court made clear that the second Montana exception included a necessity requirement. In that case, the Court considered the Montana exceptions in the context of alleged tribal jurisdiction over a car accident on a state highway running through tribal lands. After deciding that the first exception was inapplicable, the Court turned to the question of maintaining tribal safety. The Court emphasized that this power did not extend "`beyond what is necessary to protect tribal self-government or to control internal relations.'" Strate, 520 U.S. at 459, 117 S.Ct. 1404 (quoting Montana, 450 U.S. at 564, 101 S.Ct. 1245).
¶ 13 Treaties, agreements, and statutes must be liberally construed in favor of the tribe, and all ambiguities are to be resolved in its favor. Choctaw Nation of Indians v. United States, 318 U.S. 423, 431-32, 63 S.Ct. 672, 87 L.Ed. 877 (1943) ("[T]reaties are construed more liberally than private agreements.... Especially is this true in interpreting treaties and agreements with the Indians[, which are to be construed] `in a spirit which generously recognizes the full obligation of this nation to protect the interests of [the Indians].'" (quoting Tulee v. Washington, 315 U.S. 681, 684-85, 62 S.Ct. 862, 86 L.Ed. 1115 (1942))).
¶ 14 The parties agree on appeal that the incident began on the Lummi Reservation; therefore the narrow issue before us is whether McSwain had authority to stop a non-Indian driver, who pulled over after she crossed the reservation boundary, and then detain her until a deputy with jurisdiction to arrest arrived.[5]

II. Stop and Detention
¶ 15 Tribal police officers are often first responders when problems arise on reservations, but it is not always apparent during the investigation stage whether the tribe possesses jurisdiction over the offender.[6] In recognition of this problem, the United States Supreme Court has consistently affirmed that tribal police have authority to stop and detain non-Indian offenders until they can be turned over to authorities with jurisdiction. See, e.g., Duro, 495 U.S. at 697, 110 S.Ct. 2053 ("Where jurisdiction to try and punish an offender rests outside the tribe, tribal officers may exercise their power to detain the offender and transport him to the proper authorities."); Strate, 520 U.S. at 456 n. 11, 117 S.Ct. 1404 ("We do not here question the authority of tribal police ... to detain and turn over to state officers nonmembers *404 stopped on the highway for conduct violating state law." (quoting Schmuck, 121 Wash.2d at 390, 850 P.2d 1332)); see also Oliphant, 435 U.S. at 208, 98 S.Ct. 1011.
¶ 16 This court, along with the Eighth and Ninth Circuit Courts of Appeals, has also held tribal police have inherent authority to stop non-Indians who violate the law on public roads within the reservation and detain them until they can be turned over to state authorities. See, e.g., Schmuck, 121 Wash.2d at 396, 850 P.2d 1332; Ortiz-Barraza, 512 F.2d at 1180 (holding that a tribal officer was authorized to stop and search non-Indian driver on the reservation); United States v. Terry, 400 F.3d 575, 579-80 (8th Cir.2005) (upholding overnight detention of a non-Indian in a tribal jail when state law enforcement officials could not take custody until the next morning).[7] The superior court therefore correctly looked to this court's analysis in Schmuck as a starting point.
¶ 17 In Schmuck we held:
Indian tribes are limited sovereigns which retain the power to prescribe and enforce internal criminal and civil laws. This power necessarily includes the authority to stop a driver on the reservation to investigate a possible violation of tribal law and determine if the driver is an Indian, subject to the jurisdiction of that law.
Schmuck, 121 Wash.2d at 380, 850 P.2d 1332. As in Schmuck, the Lummi Nation does not assert authority to arrest and prosecute Eriksen for DUI but merely claims the power to stop and detain her until she could be turned over to Whatcom County officials. Schmuck, 121 Wash.2d at 379, 850 P.2d 1332.[8]
¶ 18 Absent controlling federal law, tribes retain jurisdiction over events in Indian country: "Perhaps the most basic principle of all Indian law, supported by a host of decisions, is that those powers lawfully vested in an Indian nation are not, in general, delegated powers granted by express acts of Congress, but rather `inherent powers of a limited sovereignty which has never been extinguished.'" COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 4.01[1][a] at 206 (2005) (quoting United States v. Wheeler, 435 U.S. 313, 322-23, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978)). Therefore, Congress may constitutionally execute provisions of a treaty even if doing so affects state interests. Antoine v. Washington, 420 U.S. 194, 203-05, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975) (absence of state as party to hunting and fishing agreements did not detract from validity). Congress's authority over Indian affairs is "plenary and exclusive," which refers to supremacy of federal over state law. Washington v. Confederated Bands & Tribes of Yakima Indian Nation, 439 U.S. 463, 470-71, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979). In Schmuck, we recognized that tribes retain their existing sovereign powers until Congress acts, 121 Wash.2d at 380, 850 P.2d 1332, even though the nature of tribes' sovereign powers is necessarily reduced by virtue of their dependent status.
¶ 19 As sovereigns, tribes exercise at least concurrent jurisdiction over all crimes committed by Indians in Indian country. See Wheeler, 435 U.S. at 328-29, 98 S.Ct. 1079. Tribes have an inherent power of self-governance, which includes the power to prescribe and enforce internal laws, including a traffic code. Schmuck, 121 Wash.2d at 381-82, 850 P.2d 1332 (citing Wheeler, 435 U.S. at 326, 98 S.Ct. 1079). "Fundamental to enforcing any traffic code is the authority by tribal officers to stop vehicles *405 violating that code on roads within a reservation." Id. at 382, 98 S.Ct. 1079. In Schmuck we stated:
Only by stopping the vehicle could [the officer] determine whether the driver was a tribal member, subject to the jurisdiction of the Tribe's traffic code. The alternative would put tribal officers in the impossible position of being unable to stop any driver for fear they would make an unlawful stop of a non-Indian. Such a result would seriously undercut the Tribe's ability to enforce tribal law and would render the traffic code virtually meaningless.
Id. at 383, 850 P.2d 1332.
¶ 20 Schmuck therefore recognized that stops are essential components of the tribe's sovereign power to make and enforce its own traffic laws against its own members. While Strate later narrowed Montana's second exception to those cases where the tribe's actions are "`necessary to protect tribal self-government or to control internal relations,'" here the Lummi Nation seeks to do exactly that. Strate, 520 U.S. at 459, 117 S.Ct. 1404 (quoting Montana, 450 U.S. at 564, 101 S.Ct. 1245). To stop offending motorists, the tribe calls upon "`the right of reservation Indians to make their own laws and be ruled by them.'" Id. (quoting Williams v. Lee, 358 U.S. 217, 220, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959)). For the tribe to make and enforce its own laws, it must necessarily be able to stop drivers who offend the tribe's traffic code to see if they fall under the tribe's jurisdiction. This requirement fits squarely into Montana's second exception.
¶ 21 Regarding the authority to detain, after a stop is made an express treaty provision requires tribal officers to detain non-Indian offenders until state authorities are able to assume custody. In 1855, the Lummi Nation and the United States entered into the Treaty of Point Elliott, which established the Lummi Reservation. Treaty between the United States and the Dwámish, Suguámish, and other allied and subordinate Tribes of Indians in Washington Territory, Jan. 22, 1855, art. 9, 12 Stat. 927 (hereinafter Treaty of Point Elliott).[9] Article 9 of the treaty expressly provides that the tribes shall turn over to government authorities anyone who violates United States law: "[T]he said tribes agree not to shelter or conceal offenders against the laws of the United States, but to deliver them up to the authorities for trial." Thus the Lummi Nation is obliged by treaty to turn over lawbreakers rather than create safe havens for them to act with impunity. See Schmuck, 121 Wash.2d at 384-85, 850 P.2d 1332 (noting article 9 reflected concern that non-Indians would attempt to avoid prosecution by hiding out on reservations (citing H.R.Rep. No. 474, 23d Cong., 1st Sess., at 98 (1834))). Accordingly, the Lummi Nation is empowered by the terms of the Treaty of Point Elliott to detain offenders until state officials can take custody. See Schmuck, 121 Wash.2d at 383-86, 850 P.2d 1332.[10] The Lummi Nation therefore has authority to stop, under its sovereign authority, and detain, pursuant to the Treaty of Point Elliott, non-Indian offenders who violate traffic laws until state authorities can assume custody.

III. Fresh Pursuit
¶ 22 "Given the inherent mobility of a driving offense, the fresh pursuit doctrine is a necessary means of cooperatively enforcing traffic laws to ensure public safety." Vance v. Dep't of Licensing, 116 Wash.App. *406 412, 416, 65 P.3d 668 (2003) (citing City of Tacoma v. Durham, 95 Wash.App. 876, 881, 978 P.2d 514 (1999)). It follows that the fresh pursuit doctrine applies to the Lummi Nation because it is a necessary means of actualizing the tribe's power to enforce its internal laws. The "power to regulate is only meaningful when combined with the power to enforce." Settler v. Lameer, 507 F.2d 231, 238 (9th Cir.1974).[11]
¶ 23 Division Three of the Court of Appeals, the Lummi Nation, and the Ninth Circuit have all allowed nontribal law enforcement officers to cross jurisdictional boundaries into Indian reservations when in fresh pursuit of suspects. Waters held that Omak Police Department officers had authority under the fresh pursuit doctrine to arrest an enrolled member of the Colville Confederated Tribes on the Colville Reservation. 93 Wash.App. at 977-78, 971 P.2d 538. The officers had seen Thomas Waters's car peel away from a stoplight and cross the center line toward police. Id. at 973, 971 P.2d 538. When the officers activated their vehicle's emergency lights, Waters led them on a high-speed chase and finally stopped on tribal reservation property, where they arrested him for felony eluding, DUI, resisting arrest, and driving with a suspended license.[12]Id. Division Three rejected Waters's argument that the officers lacked jurisdiction to stop him: "Everybody, with or without probable cause for arrest, is required to stop for the police. RCW 46.61.024. Once the police car displayed its flashing lights, Mr. Waters was required to stop, even in the absence of an infraction." Id. at 978, 971 P.2d 538.
¶ 24 Under the doctrine of "hot pursuit," the Ninth Circuit upheld the jurisdiction of a sheriff's deputy who followed a tribal member who had been "tailgating" the deputy's marked patrol car on a state highway in Indian country. United States v. Patch, 114 F.3d 131, 132-34 (9th Cir.), cert. denied, 522 U.S. 983, 118 S.Ct. 445, 139 L.Ed.2d 381 (1997). Taylor Patch, a member of the Colorado River Indian Tribe, argued that the deputy was trespassing when he followed him to his home in Indian country. The court held that the deputy had observed Patch's reckless driving and had authority to conduct a Terry[13] stop to determine if Patch was a tribal member and whether the deputy had jurisdiction to issue a citation. Id. at 134 (citing Schmuck, 121 Wash.2d at 382-83, 850 P.2d 1332 for the proposition that a tribal officer may stop a speeding vehicle if the driver is a tribal member).
¶ 25 The Lummi Tribal Court also recognized the authority of a Whatcom County sheriff's deputy to come onto the reservation in pursuit of a tribal member who allegedly stole from a convenience store outside the reservation. Lummi Nation v. Scarborough, No.2008-CRCO-2084, Dec. & Order at 1-4 (Lummi Tribal Court Jan. 5, 2009).[14] The tribal member filed a motion to dismiss, arguing that the deputy did not have jurisdiction to investigate criminal activity on tribal land and that the officer was not covered under the Lummi Nation Code of Laws, Code of Offenses, 5.07.055, which deals with obstructing a public servant as a "Law Enforcement Officer." Id. at 2. The court denied the motion, reasoning that the deputy was "attempting to investigate a crime that had taken place off the reservation by unknown individuals. He had no way of knowing whether those individuals were Lummi, *407 non-Native Lummi, or non-Native." Id. at 3. Moreover, the court noted that "[t]here are many situations that can arise that would result in an officer from a jurisdiction other than Lummi being on the reservation. It stands to reason that those officers should not be obstructed in carrying out their responsibilities any more than a Lummi officer." Id. at 3-4.
¶ 26 The doctrine of fresh pursuit has also arisen in cross-jurisdictional cases across national borders.[15] None of the settled law in these areas may be wholly applicable to tribes, however, which are dependent sovereign entities, sometimes subject to the jurisdiction of the State but also not subject to federalism. In sum, the doctrine of fresh pursuit authorizes nontribal police to cross jurisdictional boundaries into Indian country; the same policy justifying this practice applies to tribal police departments as well.
¶ 27 Eriksen argues that authorizing Indian tribes to engage in fresh pursuit without compliance with RCW 10.92.020 would nullify Washington's power to make and enforce its own laws (e.g., RCW 10.93.070, .120). Pet'r's Reply Br. at 5-8. This argument misses the mark. RCW 10.92.020 provides a mechanism through which tribal police may become "general authority Washington peace officers." Attaining this characterization would permit those tribal officers to engage in statutory fresh pursuit under RCW 10.93.070(6). However, failure to achieve recognition as a general authority Washington peace officer does not bar tribal police officers from fresh pursuit on the grounds articulated above. Similarly RCW 10.93.120(1) permits "[a]ny peace officer who has authority under Washington law to make an arrest" to "proceed in fresh pursuit" in order to effectuate that arrest. It does not, however, explicitly bar tribal officers from fresh pursuit to complete a stop initiated on the reservation.[16]
¶ 28 Accordingly, tribal, treaty, and statutory authority do not conflict. If a tribal police officer chooses to become recognized as a general authority Washington peace officer, it would add a statutory justification for fresh pursuit. But tribal police officers may rely on the grounds listed herein to engage in fresh pursuit of suspected drunk drivers first encountered on the reservation.
¶ 29 Our decision today harmonizes with common sense and sound policy. To allow drunk drivers to escape the law by crossing a reservation boundary would unnecessarily endanger lives by incentivizing high-speed dashes for the border. We decline to embrace such a ludicrous result.

CONCLUSION
¶ 30 The Lummi Nation Police Department has authority to enforce its laws by continuing the fresh pursuit of suspected drunk drivers off the reservation and then detaining those individuals until authorities with jurisdiction arrive.
¶ 31 We affirm the trial court.
*408 WE CONCUR: CHARLES W. JOHNSON, TOM CHAMBERS, SUSAN OWENS, JAMES M. JOHNSON, and DEBRA L. STEPHENS, Justices.
FAIRHURST, J. (dissenting).
¶ 1 This case presents the difficult question of whether tribal police have the authority to stop and detain a non-Indian for a violation of tribal and state law on a reservation after the alleged offender has evaded tribal police and left reservation boundaries. I join that part of the majority's analysis that finds, pursuant to inherent tribal sovereignty, that Lummi Nation Tribal Police Officer Mike McSwain had authority to stop Loretta Eriksen outside the reservation to determine whether she was a tribal member over whom McSwain had jurisdiction. However, because I cannot find any applicable authority under which McSwain had the power to detain Eriksen once he determined she was not a tribal member, I am ultimately forced to dissent.
¶ 2 The majority finds two sources of law that it claims authorized McSwain to detain Eriksen until Whatcom police arrived: the common law doctrine of fresh pursuit and the Treaty of Point Elliott. Treaty between the United States and the Dwámish, Suguámish, and other allied and subordinate Tribes of Indians in Washington Territory, Jan. 22, 1855, art. 9, 12 Stat. 927 (hereinafter Treaty of Point Elliott). A careful examination leads me to the conclusion that neither provides McSwain with the authority necessary to detain a non-Indian outside the reservation for offenses committed within the reservation's boundaries. I am mindful that, as the majority points out, this result is ludicrous. However, it is also a result compelled by the applicable law.
¶ 3 Fresh pursuit is inapplicable to this case. McSwain did not have authority to stop or detain Eriksen pursuant to statutory fresh pursuit because he is not a general authority Washington peace officer. See RCW 10.92.020; RCW 10.93.070(6), .120. Thus, any fresh pursuit authority must come from the common law. However, at common law, fresh pursuit was available only for suspected felonies. See State v. Barker, 143 Wash.2d 915, 921, 25 P.3d 423 (2001); City of Wenatchee v. Durham, 43 Wash.App. 547, 550-51, 718 P.2d 819 (1986). Driving under the influence (DUI) is not a felony.[1] RCW 46.61.502(5) (DUI is a gross misdemeanor); accord LUMMI NATION CODE OF LAWS CRIMINAL TRAFFIC CODE 6A.01.020(a)(2); 6A.02.090(d) (DUI is a class B offense subject to 30-90 days in jail and a fine of $250-$1,250). That RCW 10.93.120 expanded the definition of statutory fresh pursuit has no bearing on the common law definition, under which McSwain had no authority to stop or detain Eriksen.
¶ 4 The majority claims that article 9 of the Treaty of Point Elliott requires Lummi Nation tribal police to detain a nontribal offender outside the reservation until an officer with jurisdiction arrives. Treaty of Point Elliott, supra, 12 Stat. 929. That is not the case. Article 9 reads in part, "And the said tribes agree not to shelter or conceal offenders against the laws of the United States, but to deliver them up to the authorities for trial." Id. "This provision appears to reflect a common concern of the federal government during treaty negotiations in the mid-1800's to prevent non-Indians from hiding out on reservations in the mistaken belief that they would be free from prosecution for their crimes." State v. Schmuck, 121 Wash.2d 373, 385, 850 P.2d 1332 (1993) (citing H.R. Rep. No. 474, 23d Cong., 1st Sess., at 98 (1834)). As Eriksen was already off the reservation when McSwain stopped her, the fear of offenders hiding out on reservations was not directly implicated.
¶ 5 It is true that treaties are to be interpreted liberally, and ambiguities resolved in *409 favor of the tribes. Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 195 n. 5, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999). However, that liberal construction is supposed to determine how the Indians would have interpreted a treaty provision at the time the treaty was signed. Tulee v. Washington, 315 U.S. 681, 684-85, 62 S.Ct. 862, 86 L.Ed. 1115 (1942). It is not a blank check to rewrite the language of a treaty, even to avoid injustice. Nw. Bands of Shoshone Indians v. United States, 324 U.S. 335, 353, 65 S.Ct. 690, 89 L.Ed. 985 (1945). At the time of the treaty's signing, I find it highly unlikely that anyone would have read article 9 as the majority does. In fact, article 9 opens with the express premise that "[t]he said tribes and bands acknowledge their dependence on the government of the United States." TREATY OF POINT ELLIOTT, supra, 12 Stat. 929. The article was meant to limit tribal authority, and to read article 9 as an affirmative acknowledgment of tribal authority outside the reservation is to effectively rewrite it.
¶ 6 We, as a state court, do not have the power to imbue a treaty between an Indian tribe and the federal government with a meaning it never had. Article 9 of the Treaty of Point Elliott does not address tribal authority outside the reservation's boundaries, and not detaining Eriksen would not "shelter" or "conceal" her from the laws of the United States or the state of Washingtonshe would clearly remain subject to stop and arrest by local police. Id. McSwain certainly had the authority, perhaps even the duty, to notify the Whatcom County Sheriff's Office that an individual who appeared to be impaired was driving a car fitting the description of Eriksen's car in the vicinity of the location in which Eriksen was first stopped. However, the treaty does not contain the authority necessary for McSwain to detain her until Whatcom police arrived.
¶ 7 I again stress that I am as troubled by this case as the majority. It is ludicrous that a suspected drunk driver who has been stopped outside a reservation's boundaries by a tribal police officer must be allowed to get back on the road if she is not a tribal member. It creates perverse incentives for non-Indians to evade tribal police who attempt to stop them for traffic offenses within the reservation's boundaries. However, I cannot avoid my duty to faithfully interpret the law, and I can find no source of law under which McSwain had authority to detain Eriksen in this case.
¶ 8 To avoid similar results in the future, several approaches might be taken. The most obvious is that tribal police departments could participate in the program outlined in chapter 10.92 RCW, which provides a mechanism by which tribal police officers can be authorized to act as general authority Washington peace officers, including the power to engage in statutory fresh pursuit. The legislature may also choose to expand statutory fresh pursuit authority to include tribal police officers regardless of a tribe's participation in the chapter 10.92 RCW program. However, I do not believe that any existing source of law authorizes the result reached by the majority.
¶ 9 I regret that I must dissent. Although McSwain had authority to determine whether Eriksen was a tribal member, he did not have authority to detain her once he learned she was not a tribal member. Under the facts of this case, it is unclear when McSwain knew or should have known that Eriksen was not a tribal member. Observations McSwain made after he knew or should have known that Eriksen was not a tribal member are inadmissible and should have been suppressed.
¶ 10 I would reverse and remand for further proceedings.
WE CONCUR: BARBARA A. MADSEN, Chief Justice, and GERRY L. ALEXANDER, Justice.
NOTES
[1] Under Lummi Nation Code of Laws, Traffic Code, 6.04.050(a), all drivers must use low-beams within 500 feet of oncoming cars. Accord RCW 46.37.220, .230.
[2] LNPD officers complete training at either the Washington State Police Academy or the Federal Law Enforcement Training Academy and the Basic Law Enforcement Equivalency Academy provided by the Washington State Criminal Justice Training Commission. Br. of Amicus Curiae Lummi Nation, App. I (Aff. of Chief Gary James) at A-2. The commission, established in 1974, provides law enforcement training for all criminal justice personnel in Washington. See RCW 43.101.200; 1978 Letter Op. Att'y Gen. No. 18, at 5 (affirming commission authorized to train tribal police). All law enforcement officers must also obtain certification as peace officers from the commission, but until 2006 tribal law enforcement could not obtain this certification. See RCW 43.101.095, .157 (authorizing tribal governments to obtain certification by entering into written agreements with the commission).
[3] See also generally U.S. Attys., U.S. Dep't of Justice, Jurisdictional Summary, Title 9, Criminal Resource Manual 689, http://www.usdoj.gov/ usao/eousa/foia_reading_room/usam/title9/crm 00689.htm (last visited Oct. 12, 2010).
[4] The trial court noted, "[T]here has been for many years a dispute between the County and the Tribe as to the boundaries of the Reservation...." CP at 86 (Tr. (Jan. 26, 2006) at 71). The Lummi Nation considers both lanes of Slater Road to be within the reservation, while the county apparently claims the boundary runs down the middle of the road. Eriksen did not assign error to findings that the incident began on the reservation. This court considers unchallenged findings of fact verities on appeal. State v. Hill, 123 Wash.2d 641, 647, 870 P.2d 313 (1994). Therefore, we assume "the incident occurred or some portion of the incident occurred within the boundaries of the reservation"; the issue is whether the tribal officer had authority to pursue and detain off the reservation when the violation occurred on the reservation. VRP (Aug. 22, 2007) at 38-39.
[5] The State does not argue that even if the pursuit and detention were unlawful, the illegal arrest would not prevent subsequent prosecution. Cf. State v. Barker, 143 Wash.2d 915, 922 n. 4, 25 P.3d 423 (2001) (suppressing evidence obtained unlawfully in fresh pursuit across state borders yet leaving undecided whether the exclusionary rule applies to Washington's fresh pursuit statute). Accordingly we decide the case only on the basis of the issue set forth by the parties in their briefs. RAP 12.1(a).
[6] See generally Stewart Wakeling et al., Office of Justice Progs., U.S. Dep't of Justice, Policing on American Indian Reservations: A Report to the National Institute of Justice (July 2001), available at http://www.ncjrs.gov/pdffiles1/nij/188095.pdf.
[7] Tribal jurisdiction also occasionally extends beyond Indian country in other contexts. In John v. Baker, 982 P.2d 738, 752 (Alaska 1999), the Alaska Supreme Court upheld a tribal court's authority to adjudicate a child custody disputearising outside Indian countrybetween members of two separate tribes: "[I]n determining whether tribes retain their sovereign powers, the United States Supreme Court looks to the character of the power that the tribe seeks to exercise, not merely the location of events." In Settler v. Lameer, 507 F.2d 231, 239-40 (9th Cir. 1974), the Ninth Circuit Court of Appeals recognized the power of tribes in Washington to regulate their off-reservation hunting and fishing rights reserved by treaty.
[8] See Br. of Amicus Curiae Lummi Nation at 5 ("The Nation is asserting a sovereign interest in the act of stopping and detaining any person who violates the law while on the Lummi Reservation, even if the tribal police officer cannot complete the stop until after the motorist has driven beyond the Reservation boundaries.").
[9] The United States Senate ratified more than 400 treaties with Indian nations until 1871, when the Congress prohibited further treaty-making. Cohen's Handbook of Federal Indian Law § 4.05[1], at 276. These treaties are both a source of federal law and tribal law in areas such as tribal boundaries and use of natural resources. See, e.g., Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999) (upholding treaty right to off-reservation hunting and fishing).
[10] As we noted in Schmuck, requiring tribal officers to release non-Indians suspected of drunk driving would also be absurd:

"To hold that an Indian police officer may stop offenders but upon determining they are non-Indians must let them go, would be to subvert a substantial function of Indian police authorities and produce a ludicrous state of affairs which would permit non-Indians to act unlawfully, with impunity, on Indian lands."
121 Wn.2d at 392 (quoting State v. Ryder, 98 N.M. 453, 456, 649 P.2d 756, aff'd on other grounds, 98 N.M. 316, 648 P.2d 774 (1982)).
[11] Similarly, District of Columbia courts have held that United States Capitol Police have authority to continue pursuits that begin and go beyond the Capitol grounds. In re C.A.P., 633 A.2d 787 (D.C.1993) (officers who initiate stops on Capitol grounds may continue to pursue the motorists under doctrine of fresh pursuit); Andersen v. United States, 132 A.2d 155 (D.C.), aff'd, 102 U.S.App. D.C. 313, 253 F.2d 335 (1957) (authorizing Capitol Police to arrest outside of their jurisdiction if circumstances leading to arrest were immediately connected to their duties within the boundaries), cert. denied, 357 U.S. 930, 78 S.Ct. 1375, 2 L.Ed.2d 1372 (1958).
[12] Although two of the officers were commissioned tribal officers, the Court of Appeals considered the fresh pursuit an independent and sufficient basis for their authority to arrest on the reservation. Waters, 93 Wash.App. at 973, 978, 971 P.2d 538.
[13] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[14] See Br. of Amicus Curiae Lummi Nation, App. II at A-5.
[15] "Hot pursuit" of unauthorized oceangoing vessels across national borders is an ancient doctrine of the law of nations. See Glanville L. Williams, The Juridical Basis of Hot Pursuit, 20 BRIT. Y.B. INT'L L. 83, 84 (1939). Although no customary right of hot pursuit across national land borders evolved as it did for territorial waters, the United States Supreme Court has acknowledged that international hot pursuit across land borders did occur. See In re Kaine, 55 U.S. (14 How.) 103, 113, 14 L.Ed. 345 (1852) (noting the necessity of hot pursuit across the border between United States and British possessions in America based on treaty of 1842). Notwithstanding those realities on the ground, the doctrine of hot pursuit across national land borders never became a customary right of international law. See 1 RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 432(2) (1987) (nation's law enforcement officers may exercise their functions in the territory of another nation only with the consent of the other state).
[16] RCW 10.93.120(1) is codified in the Washington Mutual Aid Peace Officer Powers Act of 1985. Accordingly it must be "liberally construed to effectuate the intent of the legislature to modify current restrictions upon the limited territorial and enforcement authority of general authority peace officers and to effectuate mutual aid among agencies." RCW 10.93.001(3) (emphasis added). The act was passed to allow courts to consider "`the Legislature's overall intent to use practical considerations in deciding whether a particular arrest across jurisdictional lines was reasonable.'" Vance, 116 Wash.App. at 416, 65 P.3d 668 (emphasis added) (quoting Durham, 95 Wash.App. at 881, 978 P.2d 514).
[1] According to the statute in effect at the time of Eriksen's incident, a driver who "willfully fails or refuses to immediately bring his or her vehicle to a stop and who drives his or her vehicle in a reckless manner while attempting to elude a pursuing police vehicle, after being given a visual or audible signal to bring the vehicle to a stop" is guilty of a class C felony. Former RCW 46.61.024(1) (2003). However, the record contains no factual findings concerning Eriksen's manner of driving after McSwain signaled her to pull over. Without a finding that Eriksen drove recklessly after McSwain signaled for her to stop, Eriksen could be convicted only of failure to obey a police officer, which is a misdemeanor. RCW 46.61.022.