HELENE N. WHITE, Circuit Judge,
concurring in part and dissenting in part.
CONCURRING IN PART AND DISSENTING IN PART
I concur in all but section III(B) of the majority opinion. I agree that Little River was wrongly decided, that Coeur d’Al-ene (the reasoning of which Little River adopts) is inconsistent with Supreme Court precedent and premised on inapplicable dictum, and that application of the NLRA to the Tribe is inconsistent with traditional notions of tribal sovereignty. I dissent because I believe that this case is distinguishable from Little River and Coeur d’Alene on the basis that the Tribe here has treaty rights protecting its on-reservation activities.
The 1864 Treaty provides that the United States agrees to set aside the reservation land for the Tribe’s “exclusive use, ownership, and occupancy.” 14 Stat. 657 (1864). As the majority correctly notes, it is well settled that several interpretive canons inform decision making in this context. Specifically, it is black-letter law *676 that “we interpret Indian treaties to give effect to the terms as the Indians themselves would have understood them.” Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 196, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999); Choctaw Nation, et al. v. Oklahoma, et al., 397 U.S. 620, 631, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970) (“[T]reaties were imposed upon [the Indians] and they had no choice but to consent. As a consequence, [the Supreme] Court has often held that treaties with the Indians must be interpreted as they would have understood them, and any doubtful expressions in them should be resolved in the Indians’ favor.” (internal citations omitted)); Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 582, 8 L.Ed. 483 (1832) (stating that all that matters is “[h]ow the words of the treaty were understood by [the Indians at the time they entered into the treaty]”). Accordingly, “the language used in treaties with the Indians shall never be construed to their prejudice, if words be made use of which are susceptible of a more extended meaning than their plain import as connected with the tenor of their treaty.” Keweenaw Bay Indian Cmty. v. Naftaly, 452 F.3d 514, 523 (6th Cir.2006); Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985).[1]
The majority does not dispute these canons or how they apply; rather, it finds the Treaty’s general right of exclusion insufficiently specific to support the Tribe’s claim. True, the Treaty does not expressly state that the NLRA does not apply to the Tribe; nor does it say that federally recognized labor unions cannot solicit on tribal land, or that federal authorities may not enter onto tribal land. But it does not need to.
We must interpret the Treaty the way a member of the Chippewa Tribe would have understood it in 1864. See Worcester, 31 U.S. (6 Pet.) at 582; see also Mille Lacs, 526 U.S. at 196, 119 S.Ct. 1187. As memorialized in the Treaty, in exchange for “relinquishing ... several townships” to the federal government, the Tribe secured the “exclusive use, ownership, and occupancy” of the remnant it retained. 14 Stat. 657 (1864). Each and every tribal signatory signed with an “X,” indicating, if nothing else, that English was not a well-understood language. Surely, these signatories who just gave up a significant portion of their homeland, would not have understood their right to the “exclusive use, ownership, and occupancy” of their remaining land to be limited, non-specific, or subject to regulation regarding the conditions the Tribe might impose on those it permitted to enter. On the contrary, the Tribe would reasonably have understood this provision to mean that the federal government could not dictate, in any way, what the Tribe did on the land it retained. To parse the specificity of the over 150-year-old Treaty to the Tribe’s detriment violates recognized canons of interpretation. See, e.g., Naftaly, 452 F.3d at 523. To be sure, Congress could have, and can, expressly abrogate this right, Mille Lacs, 526 U.S. at 202, 119 S.Ct. 1187, but all agree it has not done so.
Absent Congress’s express direction to the contrary, the Tribe’s treaty-based exclusionary right is sufficient to preclude application of the NLRA to the Tribe’s on- *677 reservation Casino. Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982), is instructive. Although Merrion did not involve a treaty, it exhaustively interpreted the same right at issue here: a tribe’s right to exclude nonmembers from tribal lands. Id. at 144, 102 S.Ct. 894. As the majority correctly notes, Merrion made crystal clear that “[n]on-members who lawfully enter tribal lands remain subject to the tribe’s power to exclude them. This power necessarily includes the lesser power to place conditions on entry, on continued presence, or on reservation conduct.Id. Thus, whether a tribe’s right of exclusion is found in its inherent sovereignty or its treaty, a tribe with such a right also necessarily has the “lesser power” to place conditions on a non-member’s entry. See id.; cf. South Dakota v. Bourland, 508 U.S. 679, 687-88, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993) (interpreting a general right of exclusion as “embracing the implicit power to exclude others”); Montana v. United States, 450 U.S. 544, 559, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981) (same). Here, the lesser power to place conditions on a nonmember’s entry necessarily includes the power to regulate, without federal interference, the non-member’s conditions of employment.
That Little River and Coeur d’Alene relegate tribal sovereign rights of exclusion to history does not justify the abrogation of treaty-based exclusionary rights as well. Here, the Tribe’s treaty-based right of exclusion is especially pertinent given that its sovereign powers have been diminished. Indeed, the very purpose of the Treaty was to operate as a bulwark against any erosion of the Tribe’s sovereign rights that might otherwise occur. In Little River and Coeur d’Alene, the tribes’ inherent sovereignty was curtailed notwithstanding the absence of express congressional intent to do so. Where those courts derived the right or authority to make such a finding is not apparent in the reasoning of the opinions themselves, nor is it apparent from Supreme Court precedent. In any event, no treaty was involved in those cases and neither court purported to abrogate a tribe’s treaty-based rights. Thus, although Little River is controlling as to the sovereignty issue, it has no bearing on the treaty issue.
In sum, I join in the majority’s conclusion that Little River is wrongly decided but dictates that the Tribe’s inherent sovereignty cannot itself carry the day. However, the Tribe’s treaty-based exclusionary right does not suffer the same fate. At bottom, the Treaty matters, and to find otherwise suggests that the federal government’s agreement with the Tribe is worth no more than the paper on which it was written. It well may be that when a tribe’s inherent sovereignty rights are broadly interpreted, its treaty-based exclusionary right (general or specific) has little work to do. But out of necessity, the treaty-based right assumes a paramount role when a tribe’s inherent sovereignty has been judicially narrowed, and the treaty should not be narrowly interpreted. Such is the case here, and thus I respectfully dissent from section III(B) of the majority opinion.

. Of course, "Congress may abrogate Indian treaty rights, but it must clearly express its intent to do so.” Mille Lacs, 526 U.S. at 202, 119 S.Ct. 1187. This is because "a proper respect both for tribal sovereignty itself and for the plenary authority of Congress in th[e] area [of Indian affairs] cautions that [courts] tread lightly in the absence of clear indications of legislative intent.” Merrion, 455 U.S. at 149, 102 S.Ct. 894 (quoting Santa Clara Pueblo v. Martinez, 436 U.S. 49, 60, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978)). No one suggests that Congress has expressly abrogated the Tribe’s treaty rights in the NLRA.